### BROTHERHOOD OF RAILROAD TRAINMEN et al., Appellants,

v.

### ATLANTIC COAST LINE RAILROAD COMPANY et al., Appellees.

#### No. 23659.

United States Court of Appeals
Fifth Circuit.
June 15, 1966.

Allan Milledge, Neal Rutledge, Rutledge & Milledge, Miami, Fla., for appellants.

C. D. Towers, Jr., W. E. Grissett, Jr., Adam G. Adams, II, Prime F. Osborn, Jacksonville, Fla., for appellees.

Before TUTTLE, Chief Judge, RIVES, Circuit Judge, and CHOATE, District Judge.

TUTTLE, Chief Judge:

The appellant-Brotherhood and the Florida East Coast Railroad (hereinafter, "FEC") have been involved in a prolonged labor controversy, more fully described by this court at 336 F.2d 172 (see also 348 F.2d 682), centering around the company's attempt, in 1963, to institute certain changes in the collective bargaining agreement. While this court held that changes reasonably necessary to enable FEC to continue to operate could be made, the railroad, at the same time, was prohibited from effectuating other deviations until the proper statutory procedures had been exhausted, 336 F.2d at 182; see 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501, affrming 348 F.2d 682. For our purposes, this "exhaustion" process has been fully followed to no avail, and the parties now are relegated to self-help in attempting to resolve their differences, see Brotherhood of Locomotive Engineers v. Baltimore & Ohio R. Co., 372 U.S. 284, 291, 83 S.Ct. 691, 9 L.Ed.2d 759 (1963). This latter context provides the setting for the present litigation.

Thus, dipping into its economic arsenal, the FEC completely revised the rules, rates of pay and working conditions contained in existing collective agreements with employees in the crafts of trainmen, yardmen, conductors and hostlers, thereby implementing most of the changes which it had attempted to institute in 1963. The appellant Brotherhoods retaliated by striking the FEC on April 24, 1966, and subsequently, on May 4, 1966, union members commenced peacefully picketing the premises of the Jacksonville Terminal Company (hereinafter, "Terminal Company"), in an attempt to appeal to the appellees' employees to cease providing certain services, whatever they might be, for the FEC. These services include the following: (a) one-third of all freight interchange service performed by the Terminal Company; (b) minor repairs and maintenance on FEC cars and locomotives; (c) track maintenance, signaling and switching services; plus (d) whatever additional service may be contemplated in the definition of "car service" found in 49 U.S.C. Section 1(10). Since the relationship of the Terminal Company to the disputants bears substantially upon this case, it must be described before we proceed to the merits.

The appellee-Terminal Company is a Florida corporation, the stock of which is owned in equal shares by the Atlantic Coast Line (hereinafter, "ACL"), Seaboard Air Lines (hereinafter, "SAL"), FEC and Southern Railroads. It owns and operates a rail terminal, rail yards, interchange facilities and the only passenger station located in Duval County,

Florida, and provides passenger, freight and mail service for the state of Florida by furnishing connecting services to the above four railroads, as well as to the Georgia Southern and Florida Railway. The Terminal Company has its own officers and employees, who work under separate collective bargaining agreements negotiated between it and the respective unions which represent its employees. However, despite the legal separateness of the Terminal Company's entity and operation, it cannot be disputed that the facilities and services provided by the Terminal Company *in fact* constitute an integral part of the day-to-day operations of the FEC, which continues to operate both passenger and freight trains by means of its own striker replacement crews.

At this point, in order more fully to set out the factual stage for this case, it must be noted that the Terminal Company employees allegedly perform such work and services for the FEC pursuant to the terms of a preliminary injunction entered by the lower court on January 30, 1963, in case No. 63–16–Civil J, Florida East Coast R. Co. v. Jacksonville Terminal Co. et al. This latter injunction was obtained by the FEC in order to assure that its operations would not be disrupted by the threatened work stoppage by Terminal Company employees, in response to the threatened picketing of the Terminal Company's premises by striking FEC employees. The asserted bases for the issuance of said injunction were (a) defendants' violation of FEC's rights under an "Operating and Guaranty Agreement" between FEC, Terminal Company, ACL, SAL, Southern and Georgia Southern and Florida, and (b) defendants' refusal to perform duties owed FEC under the Interstate Commerce Act. Although the lower court's order specifically purported to bind the employees of both the defendant Terminal Company and the Railroad defendants, the court denied an application by the union representatives of said employees to intervene in an attempt to dissolve this injunction. The prelim-

inary injunction issued in said Case No. 63–16 remains in effect at this time. It was not appealed, since the brotherhoods were not permitted to intervene, and thus there was no aggrieved party. The plaintiffs-appellees in the instant case contend that if this court stays the injunction entered below, they will be forced, through no fault of their own, to violate the outstanding injunction entered in Case No. 63–16.

Appellants' picketing of appellees' premises can be described as peaceful and effective. The picketing was not limited to the gate allegedly "designated" for entrance and exit of FEC employees; rather, it covered substantially the entire Terminal Company premises, as well as other contiguous sites in Duval County which were under the sole control and operation of the ACL and SAL. As a result of the picketing, hundreds of appellees' employees refused to work. However, the temporary restraining order entered by the lower court in this action caused the pickets to be removed approximately thirteen hours after the time of their commencement.

The specific purpose of the appellants' picketing in this case is highlighted by the testimony of Mr. Raymond C. Moore, Deputy President, Brotherhood of Railroad Trainmen, given at the Preliminary Injunction hearing, to the effect that if the Terminal Company "cease to provide services * * * for the FEC and cease to handle movement of FEC trains on its property," the pickets would be removed.

Attempting to translate the factual description of appellant's activities into labor jargon, for purposes of legal analysis, this was an attempt, through peaceful picketing, to elicit a secondary boycott of the FEC by the appellee-companies, which depended for its success upon the aid of appellees' employees in refusing to cross appellants' picket lines [Perhaps appellants' activity could be more simply described as an attempt to elicit a "secondary *labor* boycott" on the part of appellees' employees.].

Appellants maintain that the provisions of the Norris-LaGuardia Act, 29

U.S.C. Section 101 et seq. deprive the district court of jurisdiction to enjoin the picketing here involved. The District Court, without elaborating, held that the Norris-LaGuardia prohibition was "not applicable to the instant proceedings * * *" and enjoined the picketing, presumably upon the basis that it unlawfully interfered with legal obligations which the appellees owed the FEC by virtue of (a) the Operating and Guaranty Agreement; (b) the Interstate Commerce Act; and (c) the injunction previously entered in Case No. 63–16.

The applicable sections of Norris-LaGuardia provide as follows:

Section 4 (29 U.S.C. Section 104):

"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

\* \* \* \* \* \*

(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;

\* \* \* \* \* \*

(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified."

Section 13 (29 U.S.C. Section 113):

When used in this chapter, and for the purposes of this chapter—

(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or association of employees; or when the case involves any conflicting or competing interests in a "labor dispute" (as defined in this section) of "persons participating or interested" therein (as defined in this section).

(b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.

(c) The term "labor dispute" includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

(d) The term "court of the United States" means any court of the United States whose jurisdiction has been or may be conferred or defined or limited by Act of Congress, including the courts of the District of Columbia. Mar. 23, 1932, c. 90, § 13, 47 Stat. 73."

■ In light of the history underlying the passage of this Act[1] especially the unions' prior unsuccessful attempt, in Sections 6 and 20 of the Clayton Act (38 Stat. 731 and 738), to remove the federal courts from the injunction granting business in a similarly described context,[2] we are not surprised to find a paucity of decisions dealing directly with the question of whether so-called "secondary boycott" activity of employees and unions may be within the protection of Norris-LaGuardia. Like Justice Frankfurter, reputedly the author of the Act, we would have assumed that the jurisdictional limitations of Norris-LaGuardia apply to secondary boycotts, see Bakery Sales Drivers Union v. Wagshal, 333 U.S. 437, 442, 444, 68 S.Ct. 630, 92 L.Ed. 792 (1948); Amalgamated Ass'n of Street, Electric Ry. & Motor Coach Employees v. Dixie Motor Coach Corp., 170 F.2d 902 (8 Cir., 1948). However, since there appears to be no authoritative Supreme Court holding to this effect and since the contrary proposition was so forcefully argued by appellees, we proceed to examine the merits of this question. Before passing, it should be emphasized that we here deal only with the enjoinability of appellants' activity and not with its legality for any other purpose.[3]

■ At first blush, giving the terms of the Act their literal meaning,[4] this appears to be a "case involving or growing out of a labor dispute" (Section 4, 29 U.S.C.A. Section 104), since it "involves persons who are engaged in the same industry, trade, craft, or occupation" (Section 13, 29 U.S.C.A. Section 113). Accordingly, a literal reading of the Act would prevent any federal court from issuing an injunction "to prohibit any person or persons participating or interested in such dispute * * * from

---

1. An excellent discussion of the events leading up to and culminating in the passage of Norris-LaGuardia is contained in Gregory, Labor and the Law, 158–199 (2d Rev. ed. 1961).

2. This prior effort was rendered abortive by the Supreme Court in Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921), which involved an attempt by an international union to unionize a non-union printing press company. Although the non-union factory in question was located in Michigan, the union exerted pressure, not directly upon the factory, but rather, upon its customers and their employees. The means of exerting said pressure may be described legally as a "secondary *labor* boycott"—members of the union refusing to work on the company's presses where they were installed or to work for anyone who used them—*to be distinguished* from the instant case, where the pressure upon the "secondary employees" was initiated by striking employees of the "primary employer," FEC. The Supreme Court held that the anti-injunction provisions of § 20 of the Clayton Act could be invoked only by employees "who are proximately and substantially concerned as parties to an actual dispute respecting the terms or conditions of *their own* employment * * *" (Emphasis added) and only in the context of "particular industrial controversies not a general class war." 254 U.S. at 472, 41 S.Ct. at 178.

In a strong dissent, Justice Brandeis (joined by Justices Holmes and Clarke) concluded that in the Clayton Act Congress had declared "the right of industrial combatants to push their struggle to the limits of the justification of self-interest," 254 U.S. 488, 41 S.Ct. at 184 and he articulated the interest of a union in the terms and conditions of employment prevailing in non-union plants in the same industry, according to the better-reasoned common law decisions, id. at 480–483, 41 S.Ct. at 181–182.

3. In Norris-LaGuardia, Congress did not, as it had done in the Clayton Act, make the conduct listed lawful for all purposes. The most logical inference from this fact is that in Norris-LaGuardia Congress intended only to remedy abuses of judicial equity power relating to injunctions, allowing the law relating to the "legality" of the described activity for other purposes to develop in the courts.

4. Of course, this court is not required to accept this literal construction, under the "familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of the makers." NLRB v. Fruit & Vegetable Packers, etc., 377 U.S. 58, 72, 84 S.Ct. 1063, 1071, 12 L.Ed.2d 129 (1964) (quoting from Holy Trinity Church v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 36 L.Ed. 226).

* * * giving publicity to the existence of, or the facts involved in, any labor dispute * * * by advertising * * * patrolling, or by an other method not involving fraud or violence" (Section 4, 29 U.S.C.A. Section 104). The surface appeal of this literal construction of the Act is reinforced by the view that in such a common industry context the responses of employees of the secondary employer are not totally sympathetic, but rather, are motivated partially by the self-interest of the responding employees. Such self interest may be said to lie in their hope that in helping to further the bargaining position of their "brothers," they are, at the same time, strengthening their own future position.[5]

■ On the facts here, however, the court is not forced to rely upon this literal construction of the Act in holding that Norris-LaGuardia is applicable, since the union's position finds even stronger support when measured according to traditional economic self-interest justification concepts, which we hold are applicable to determine the intended scope of Norris-LaGuardia protection. Although there does not appear to be direct Supreme Court authority for this latter proposition, we find it to be implicit in Justice Brandeis' dissent in the *Duplex* case (see note 2, supra) together with the subsequent passage of Norris-LaGuardia.[6]

■ As we see it, this "economic self-interest" test, by definition, must be primarily a factual inquiry. In this case the picketing union, allegedly attempting to limit the scope of its appeal to its dispute wtih FEC,[7] had an obvious interest in putting a stop to the Terminal Company's performing services related to the normal, day-to-day operation of FEC trains—operating with striker replacement crews.[8] A similar interest is present in any case in which a labor group attempts to bring secondary pressure upon the employer with whom its primary dispute exists by means of exerting pri-

---

5. Of course, this same argument also would apply to the situation where the only link between the picketing union and the responding employees is the "brotherhood" they share as members of the organized labor movement, whenever the ultimate result would be to strengthen unionism as a whole. Without attempting to decide exactly where Congress intended to draw the line of Norris-LaGuardia protection, we nevertheless note that the interest shared by organized labor is much more remote than the common industrial interest shared by the employees in this case. Nor does the interest shared by organized labor come within a literal reading of the Act, as does the common industrial interest.

6. Implicit support for this holding also may be found in New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 562–563 (1938). (Norris-LaGuardia passed to overcome qualifying effects of Duplex decision). And cf. Carpenters & Joiners Union v. Ritter's Cafe, 315 U.S. 722, 724–728, 62 S.Ct. 807, 86 L.Ed. 1143 (1942); United States v. Hutcheson, 312 U.S. 219, 231–236, 61 S.Ct. 463, 85 L.Ed. 788 (1941). These latter two cases support the proposition that the proper framework for a Norris-LaGuardia "labor dispute" falls substantially short of an all-out class war, unrelated to fairly direct economic interests of the disputants.

In the words of Professor Charles O. Gregory:

"It is as if Congress had said in [the Norris-LaGuardia] act:

'This you may do, using the techniques we have suggested, as long as you can show that your union economic program, conceived as you and not anyone else sees it, is affected by the existing employment conditions in the units of the industry with which you are concerned. We have instructed the judges to withhold the use of the injunction against your self-help coercive activities directed along these lines. From now on it is up to you union people to promote your own economic interests, as you see them, within the area of conflict we have defined.' "

Gregory, Labor and the Law, 192 (2d Rev. ed. 1961).

7. The picket signs bore the following: "Fellow Railroad Men
Do Not Cross or Assist FEC
B of R T on Legal Strike Against FEC
Please Make Common Cause With Us
In Major Dispute Against FEC"

8. Compare United Steelworkers v. NLRB, 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964).

mary pressure upon a secondary employer, who has aligned himself with the primary employer in some substantial manner—here by providing certain essential services and facilities to the primary employer, FEC.[9]

Turning next to a further examination of the economic interests of the responding employees of the secondary employer-appellees, it should be emphasized that their interests go beyond the "common industrial interest" discussed above. It can be stated unequivocally that Seaboard and FEC are in direct competition for passenger and freight traffic south of West Palm Beach. As far as the ACL and FEC are concerned, the competition, although less direct, cannot be said to be non-existent, especially between Jacksonville and a line drawn from Orlando to the Atlantic Ocean. The significance of this competition lies in the fact that the FEC, by changing work rules [10] and lowering wages, presents a direct threat to the job security of the employees of SAL and ACL.[11] In other words, by operating under such lower than union standards of employment, the FEC enjoys a competitive advantage, which may enable it to increase its share of traffic, vis a vis, ACL and SAL, and, consequently, the latter two railroads could be forced to either (a) lower their standards or (b) lay off a sufficient number of employees to compensate for their reduced traffic share. Accordingly, it is improper to regard the responses of ACL and SAL employees as merely sympathetic.

Thus, it is clear that the economic self-interest test is met here from not one, but two, viewpoints: (a) the economic interests of the defendant-pickets themselves, and (b) the economic interests of the responding employees of the secondary employers, without whose aid the picketing would be ineffectual. Accordingly, the district court was prohibited from issuing the injunction by Norris-LaGuardia.

One final point: Appellees argue that under the circumstances of this case Norris-LaGuardia should be "accommodated" to the Interstate Commerce Act and the Railway Labor Act, so that (a) appellees' duty to the public under the former act can be carried out and (b) the national railway labor policy expressed in the latter, given effect. We deem the argument based upon the Railway Labor Act to be without substance. Regarding the argument based upon the Interstate Commerce Act, the short answer is found in Order of Railroad Telegraphers v. Chicago & North Western Ry., 362 U.S. 330, 339, 80 S.Ct. 761, 4 L.Ed.2d 774 at note 15, where the Court cited "cases to show that unlawfulness under nonlabor legislation did not remove the restrictions of the Norris-LaGuardia Act upon the jurisdiction of federal courts." [12]

Since the district court was without jurisdiction to enjoin the picketing involved in this case, the judgment is reversed, and the case is remanded to the district court with directions to vacate the injunction.

CHOATE, Senior District Judge (dissenting):

The issue before this court is whether a United States District Court has jurisdiction to enjoin railroad employees engaged in a labor dispute with their employer, which is not a party to this litigation, from interfering with the

---

9. Compare NLRB v. Fruit & Vegetable Packers, etc., 377 U.S. 58 (1964) (substantial alignment present) with Carpenter's & Joiners Union v. Ritter's Cafe, 315 U.S. 722, 62 S.Ct. 807, 86 L.Ed. 1143 (1942) (no alignment at all).

10. The changes here severely reduced the number of employees needed for daily operations, by eliminating what the FEC considered to be unnecessary employees.

11. In this limited sense, at least, the case is substantially similar to, and probably controlled by Marine Cooks & Stewards v. Panama Steamship Co., 362 U.S. 365, 80 S.Ct. 779, 4 L.Ed.2d 1151 (1960).

12. See also Brotherhood of Locomotive Firemen and Enginemen v. Florida East Coast Ry., 346 F.2d 673, 676–677 (5 Cir., 1965).

business and the legal duties[1] of carriers and other persons in the railroad industry with whom those employees have no labor dispute.

If the use of the court's injunctive powers is not forbidden by the Norris-LaGuardia Act §§ 4, 13, 47 Stat. 70, 73 (1932), 29 U.S.C. §§ 104, 113, the court below had jurisdiction to issue an injunction. See 28 U.S.C. §§ 1331, 1337; Florida E. C. Ry. v. Jacksonville Terminal Co., 328 F.2d 720 (5th Cir. 1964); Lakefront Dock & R. R. Terminal Co. v. International Longshoremen's Ass'n, 333 F.2d 549 (6th Cir. 1962); Toledo, P. & W. R. R. v. Brotherhood of R. R. Trainmen, 132 F.2d 265 (7th Cir. 1943). Stated in Norris-LaGuardia terms, the issue is: whether this action is between persons involved in a labor dispute or; whether the subject matter of the litigation involves or grows out of a labor dispute in which appellants and appellees are participating or interested.

I would hold that the court below had jurisdiction to issue the injunction, since there is no labor dispute *between these parties*, nor does the subject matter of this case "involve" or "grow out of" any *labor dispute*.

Substituting the definition of "labor dispute," provided by § 13(c) of the act (29 U.S.C. § 113 [c]), where appropriate in section 4 (29 U.S.C. § 104), the statute provides:

No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating [etc.] * * * terms or conditions of employment,[2] regardless of whether or not the disputants stand in the proximate relation of employer and employee.

There is no controversy or even disagreement between appellees and appellants concerning terms or conditions of employment, or employee representation. No labor demands have been made on appellees, and at no relevant time has there existed any labor dispute of any nature between appellees and the striking-picketing employees of FEC or their unions, or between the appellees and their employees. The plain meaning of the statute does not give an anti-injunctive shield to one group of railroad employees, who are engaged in an unresolved labor controversy with their employer over terms and conditions of employment, when they unilaterally carry that controversy over to non-involved rail facilities.

The last phrase in the definition of labor dispute in section 13(c), "regardless of whether or not the disputants stand in the proximate relation of employer or employee," was inserted into the Norris-LaGuardia Act as a direct result of the holding in Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921), which construed the Clayton Act to withhold protection from labor unions that had no contractual relationship with the employer in question, and which, by their nature, could not be employees. A primary purpose of Congress in passing the Norris-LaGuardia Act was to broaden the definition of "dispute" so that

1. Duties concerning car service and interchange of traffic are imposed upon appellees under: the Interstate Commerce Act, 49 U.S.C. §§ 1, 3 (1952 ed.); Operating and Guaranty Agreement authorized and approved by the Interstate Commerce Commission and by United States District Court for the Southern District of Florida; and the injunction (Case No. 63-16) referred to in the opinion.

2. It is instructive to note that the definition of "labor dispute" as originally presented to each house included, at the point indicated above, a controversy "concerning employment relations, or any other controversy arising out of the respective interest of employer and employee." That phrase, which might support the finding of a "labor dispute" in the case at bar, was stricken from what is now section 13(c). 75 Cong.Rec. 5008 (1932) (Senate); Id. at 5510 (House of Representatives).

the labor organization could act for employees by picketing an employer without being subject to injunction. 75 Cong.Rec. 4916 (1932) (remarks of Senator Wagner); Donnelly Garment Co. v. International Ladies' Garment Workers' Union, 20 F.Supp. 767, 771 (W.D.Mo.1937). See also 75 Cong.Rec. 5489 (1932) (remarks of Congressman Celler concerning Dail-Overland Co. v. Willys-Overland, Inc., 263 F. 171, 192 [N.D.Ohio 1920] [wherein strikers were held to be no longer "employees" under the Clayton Act]). It is clear that " * * * the statutory classification, however broad, of parties and circumstances to which a 'labor dispute' may relate does not expand the application of the Act to include controversies upon which the employer-employee relationship has no bearing." Columbia River Packers Ass'n v. Hinton, 315 U.S. 143, 146, 62 S.Ct. 520, 522, 86 L.Ed. 750 (1942).

Subsection (a) of section 13 (29 U.S.C. § 113 [a]) defines the relationships of "persons" who may be parties to a "case" which arises out of a "labor dispute." To take section 13(a) *alone* as a definition of "case involving or growing out of a labor dispute," without regard to section 13(c) would be a patently incorrect approach to the interpretation of the statute here involved. Such a construction leads to the indefensible result that appellant-brotherhoods can picket and close down any terminal anywhere in the nation through which an FEC car passes. Merely because all parties to this action are either railroad employers or railroad unions and thus admittedly "engaged in the same industry," does not justify the blind conclusion that they are therefore persons involved in a labor dispute or that *any* case to which they are parties grows out of or involves a labor dispute.

"If any intelligent meaning is to be gathered from section 13, it is necessary that the several provisions of the section be read together, although grammatically its parts are independent. * * * [I]t is clear that the definition of 'labor dispute' given in subdivision (c) must be read into subdivisions (a) and (b). There cannot then be a 'labor dispute' unless there is a controversy between the disputants either 'concerning terms or conditions of employment' or concerning the 'association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment.'" Donnelly Garment Co. v. International Ladies' Garment Workers' Union, 20 F.Supp. 767, 770 (W.D. Mo.1937).[3]

My brothers on the bench "would have assumed" that secondary boycotts are within the anti-injunction protection of the act, but nevertheless stated that they would examine the question. Propounding the rather uncertain economic self-interest test, they concluded that the test was met from two viewpoints—that of

---

3. In Marine Cooks v. Panama S. S. Co., 362 U.S. 365, 370, 80 S.Ct. 779, 4 L.Ed. 2d 1151 (1960), the court necessarily checked the status of the litigants and found, that the controversy did involve and was between persons who were engaged in the same industry. The court used the precise language of section 13(c) (which sets forth the requisites of "controversy") in direct connection with the precise language of section 13(a) (which defines "case").

*Marine Cooks* cannot be authority for appellants' contention that a person who is not involved in or interested in the labor dispute is nevertheless barred by Norris-LaGuardia from obtaining an injunction to protect his business. The plaintiffs in *Marine Cooks* were the very persons who were primarily responsible for setting the wages and working conditions over which the dispute arose. This case goes no further than to hold that there may be a non-enjoinable labor dispute between an employer and a union (not the representative of the employer's employees) which is designed to bring pressure on the employer to change wages and working conditions of his employees. This case does not even relate to a situation wherein a non-disputant is picketed for the purpose of compelling that non-disputant to cease doing business with the employer of the pickets.

defendant-picketers and that of the "responding employees of the secondary employers." However, it does not appear that appellants in the case have conflicting or competing interests [4] in any labor dispute.

The court readily appreciates that appellee-railroads and FEC compete against each other in the market for freight and passenger customers. The logical evaluation of that competition, in basic terms of economic self-interests, supports the conclusion that appellees, FEC's competitor railroads, would be benefited if affected at all by appellants' prevailing over FEC. Hardly can appellee-railroads' interest be said to be aligned against its competitor's adversary.

> "And 'persons' must be involved on *both* sides of the case, or the conflicting interests of 'persons' on both sides of the dispute." United States v. United Mine Workers, 330 U.S. 258, 275, 67 S.Ct. 677, 687, 91 L.Ed. 884 (1947) (Emphasis supplied.)

The "economic self-interests" of appellee's employees (not parties to this suit), upon which the court bases one of its viewpoints, is a finding not supported by the record—a conclusion that FEC operates at lower than union standards of employment. It has not been established that FEC's employees' working conditions are any better or worse than ACL's or SAL's. Can it be said that Congress intended to change the usual legal definition of a labor case by granting members of a very small union the right to use coercive methods directly against an innocent party who is helpless to give the laborers relief? Such a construction of the act would bring about inequitable results, and in the absence of clearly compelling lan-

guage, should not be made. Gomez v. United Office Workers, 73 F.Supp. 679, 682 (D.C.Dist. 1947).

It should not be lightly assumed that Congress intended to embrace secondary boycott activity within the jurisdictional limitations of Norris-LaGuardia.[5]

The consistent theme reflected by the history of the act's passage in both houses is the statement and re-statement by the lawmakers to the effect that the "bill does nothing more or less than put into actual effect what the Congress did years ago when they passed the Clayton Act"; that the act under consideration was necessary to save the Clayton Act from judicial misconstruction. E.g., 75 Cong.Rec. 5479, 5486, 5488, 5490 (1932). "There is not an underlying principle written into this bill which Congress did not enact into law back in 1914, when the Clayton Act was passed." Id. at 5478 (remarks of Congressman LaGuardia).

In passing the Clayton Act, Congress had no intention of going so far as to allow the secondary boycott. Congressman Webb, who conducted the bill through the House, made the following remarks on the question of whether the bill would legalize the secondary boycott:

> "[T]his section was drawn * * * with the careful purpose not to legalize the secondary boycott, and we do not think it does. * * * and it is not intended to do so." 51 Cong.Rec. 9652 (1914).

This section "was drawn carefully, and those who drew this section drew it with the idea of excluding the secondary boycott. It passed the House * * * and the question of the secondary boycott was not raised then, because we understood so clearly it did

---

4. Terminal Company is a separately operated Florida corporation, in which FEC is a minority stockholder. With the exception of some very minor passenger ticket service ($\frac{1}{2}$ of 1%), all services presently furnished to FEC by the Terminal Company, are mandatory under the Interstate Commerce Act.

5. The Supreme Court has not ruled on the central issues here involved. However, in Bakery Sales Drivers v. Wagshal, 333 U.S. 437, 68 S.Ct. 630, 92 L.Ed. 792 (1947), a secondary boycott was involved and the Court held that no labor dispute existed.

not refer to or authorize the secondary boycott." Id. at 9653.

"I should vote for the amendment offered * * * if I were not perfectly satisfied that it is taken care of in this section [§ 20]. The language the gentleman reads does not authorize the secondary boycott and he could not torture it into any such meaning. * * * I say again—and I speak for, I believe, practically every member of the Judiciary Committee—that if this section did legalize the secondary boycott, there would not be a man vote for it. It is not the purpose of the committee to authorize it, and I do not think any person in this House wants to do it. We confine the boycotting to the parties to the dispute * * *." Id. at 9658.

The abuses[6] under the Clayton Act which Congress sought to remedy by Norris-LaGuardia did not involve injunctions in secondary boycott situations, especially those which might profoundly affect interstate commerce operations.

A protracted discussion in the House of Representatives centered around the contention that the limitation of injunctions provision would interfere with transportation in interstate commerce and Mr. LaGuardia's assurances that no such results would follow.[7]

The extreme and harmful consequences of the construction of Norris-LaGuardia adopted by this court are not to be ignored. In appellant's own words:

"The unleashing of the parties to engage in economic warfare has serious consequences to third parties to the dispute and to the public * * *. Interference with the mails, with the shipment of perishables and vital materials is the inevitable result when an impasse is reached. It is the aim of the striking organizations (appellants) to cause FEC operations to cease. * * * To accomplish this aim, the organizations have picketed wherever the FEC operates and have requested those persons who perform services for the FEC to cease performing such services." Brief of Appellants, pp. 7–8 (filed May 23, 1966).

Since appellee's yard lies astride of the northeast entrance to the Florida peninsula, manifestly the halting of the Terminal Company operations will: stop daily shipments of great quantities of baggage, express, freight, fresh vegetables, citrus, phosphate rock and other commodities in interstate commerce into and from Florida through Terminal Company facilities; eliminate all carriage and processing of United States

---

6. Those abuses concerned "yellow dog contracts," ex parte injunctions, and sweeping injunctions against unnamed and unknown persons. E. g., 75 Cong.Rec. 5488, 5489, 5491 (1932) (debates in the House of Representatives); 75 Cong.Rec. 4504–4506 (1932) (debates in the Senate).

7. Question by Mr. Lankford of Virginia: "Does this make it possible for lack of an injunction to tie up railroads and prevent them from transporting milk, for instance?"
Mr. LaGuardia: "[T]he railroad labor act * * * takes care of the whole labor situation pertaining to the railroads. They could not possibly come under this for the reason that we provided the machinery there for settling labor disputes."
Mr. Lankford: "It [Norris-LaGuardia bill] does not apply to the transporta-

of * * * necessities that go in interstate commerce?"
Mr. LaGuardia: "Interstate traffic is entirely covered in the railroad labor act of 1926." 75 Cong.Rec. 5499 (1932). To the same effect, see pages 5478, 5504.
Other congressmen argued in favor of specifically excluding the anti-injunction provisions "where a labor dispute involves the obstruction of any instrumentality of interstate commerce." Id. at 5503. The amendment was rejected and the bill passed after the following remarks by Mr. LaGuardia:
"[T]he present bill refers only to disputes between employees and employer. The amendment offered * * * brings in the * * * provision for which there is adequate law and which it is not intended to repeal by the provisions of this bill. This is limited to matters between employees and employers." Ibid.

mail by rail into the State of Florida, which is estimated to represent approximately 95 per cent of all mail coming into and carried from Florida; blockade ACL and SAL passenger service, consisting of 42 trains per day; block practically all ACL freight service to important seaport docking facilities and to the peninsula as a whole; obstruct freight service to military installations in Florida, including ACL and SAL traffic destined for the Cape Kennedy complex.

The Norris-LaGuardia Act should not have been interpreted as applicable to the type of situation presented by the instant case.

I would affirm the court below.