**JACKSONVILLE TERMINAL COMPA- NY, Atlantic Coast Line Railroad Company and Seaboard Air Line Railroad Company, Appellants,**

v.

**FLORIDA EAST COAST RAILWAY COMPANY, Appellee.**

**FLORIDA EAST COAST RAILWAY COMPANY, Appellant,**

v.

**ATLANTIC COAST LINE RAILROAD COMPANY and Seaboard Air Line Railroad Company, Appellees.**

No. 22931.

United States Court of Appeals Fifth Circuit.

July 7, 1966.

Rehearing Denied Aug. 11, 1966.

John S. Cox, Yardley D. Buckman, Clark W. Toole, Jr., Jacksonville, Fla., for appellants; Kurz, Toole, Maness & Martin, Cox, Grissett & Webb, Jacksonville, Fla., of counsel.

Chester Bedell, Robert P. Smith, Jr., Raymond Ehrlich, Marion R. Shepard, Jacksonville, Fla., for appellees; Bedell, Bedell, Dittmar & Smith, Mathews, Osborne & Ehrlich, Jacksonville, Fla., of counsel.

Before BROWN and COLEMAN, Circuit Judges, and DAWKINS, District Judge.

JOHN R. BROWN, Circuit Judge:

Now on its second trip following our earlier holding that there was federal-question jurisdiction, 28 U.S.C.A. § 1337, Florida East Coast Ry. v. Jacksonville Terminal Co., 5 Cir., 1964, 328 F.2d 720, cert. denied, 1964, 379 U.S. 830, 85 S.Ct. 59, 13 L.Ed.2d 38, this appeal presents the merits of the controversy. That controversy essentially presents a single question: shall the law give effective recognition to the plain terms of a private contract made between experienced, mature parties of exceptional bargaining strength, the legality of which all concede and no one challenges? The answer here, as it was below, is in the affirmative. We therefore affirm.

The contract, though plain and positive, is indeed most unusual. The con-

troversy centers around Art. 21.[1] Under it any of the owner-lines is entitled at any time to demand the dismissal of the President or General Manager of the Jacksonville Terminal, their jointly owned terminal subsidiary. Likewise, selection of a new President requires the unanimous approval of all owner-lines.[2] Since February 1963, an impasse has existed. At that time 50% of the owner-lines demanded the dismissal of Marshall C. Jennette, President and General Manager of the Company, who entered on his office shortly before on August 1, 1962.[3] The other 50% agree this demand is lawful, but they decline to do anything about it. In the meantime, Mr. Jennette continues to hold and exercise his office. The District Judge put the train back on the tracks by the order, now under review, in which the recalcitrant 50% were ordered and "directed to join in effecting a prompt termination of the services" of the President and the General Counsel.

For our purposes, the background facts may be severely capsulated. In 1947 the five Railroads comprising the owner-lines [4] made an agreement for the continued joint ownership and operation of the Jacksonville Terminal and the guaranty by four of them of the payment of principal and interest on four million dollar issue of refunding bonds and other financial obligations of the Terminal. As a part of this transaction, the parties executed what is described as the Operating and Guaranty Agreement. Art. 21, note 1, supra, was contained in this agreement.

Since this pertained to the continued joint operation and control of a carrier by two or more other carriers, it was necessary to obtain approval of the Interstate Commerce Commission under § 5, 49 U.S.C.A. § 5(2).[5] The Commission

---

1. " * * * the President or General Manager or any other officer subject to election by the Board of Directors of the Terminal Company, shall be appointed and serve only by the unanimous consent of the Guarantor Companies and shall (any provision of the By-Laws of the Terminal Company to the contrary notwithstanding) be dismissed upon the written request of any one of the railway companies, and * * * the dismissal of any subordinate official of the Terminal Company shall be made by the President or the General Manager upon the written request of any one of the railway companies."

2. This "unanimous consent" approach is found elsewhere in many other parts of the Guaranty and Operating Agreement, including issuance of new bonds, changes in accounting procedure, disbursement of certain funds, incurring debts for construction, furnishing of new facilities, issuance of capital stock, and the like.

3. The letter also demanded the dismissal of Mr. Elliott Adams, General Counsel.

4.
| | | |
|---|---|---|
| Coastline: | Atlantic Coast Line Railroad Company | ¼th |
| Seaboard: | Seaboard Air Line Railroad Company | ¼th |
| FEC: | Florida East Coast Railway Company | ¼th |
| Southern: | Southern Railway Company | ⅛th |
| * Georgia Southern: | Georgia Southern and Florida Railway Company | ⅛th |

The same proportional representation was established for the 8-man Board of Directors, the Presiding Officer of which was the President.

* Georgia Southern was not one of the Guarantors.

---

5. The report and order are found in the ICC unpublished report, Finance Docket No. 15884, Jacksonville Terminal Company Bonds and Finance Docket No. 15885, Jacksonville Terminal Company Joint Use. The bonds are described as $4,000,000 of first-mortgage bonds issued for redemption of a like aggregate principal of outstanding bonds.

by report and order formally approved the issuance of the bonds. Additionally it declared that continued joint use of the Terminal by the owner-lines "will be consistent with the public interest" and "that the terms and conditions" of the Operating and Guaranty Agreement "are just and reasonable." Although no specific mention is made of it, this approval thereby approved the much mooted Art. 21.

On February 8, 1963, FEC made a written demand that Jennette [6] be dismissed pursuant to the Operating Agreement. An effort by FEC and its allies, Southern and Georgia Southern, having a combined 50% voting power to implement this demand by stockholder resolutions directing the Board to relieve these officers was frustrated by Coastline's and Seaboard's combined 50% opposition. Not surprising, Coastline's and Seaboard's counter move to postpone formally dismissal until a successor President was selected met a similar fate at the combined hands of FEC-Southern-Georgia Southern. Thus with neither train deferring the right-of-way to the other at the intersection, neither can move.

As stated before, none of the parties to the contract challenge its validity. Hence, Coastline and Seaboard as appellants here candidly recognize that FEC's written demand of February 8, 1963, was legally authorized and that no owner-line, alone or in combination, could challenge either the right to make the demand or its effectiveness as a "dismissal." But, they assert, the dismissal is not the whole thing. Rather, it is related to the *time* when the dismissal becomes effective.

And for this, they bring in the Florida Corporation statutory "holdover" doctrine reflected in F.S.A. §§ 608.40, 608.51.[7] Under this doctrine, so they contend, the dismissal, although binding and legal, is not effective until such time as the successor is named. They carry this argument so far as to assert that had the by-laws of the Terminal Company expressly provided what Art. 21 requires, the by-laws would have been illegal under Florida law. The whole attack rests, therefore, on application of Florida law.[8]

This attack has no merit. We would have, first, a great deal of doubt that the Florida holdover doctrine would ever serve to continue in office one who has legally been discharged. But we think that on matters having such direct relationship to the effective operation of an important instrumentality of interstate commerce, federal, not state, standards must control. International Ass'n of Machinists, etc. v. Central Airlines, Inc., 1963, 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed.2d 67; Textile Workers Union of America v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972. The fact that the physical activities of the Terminal Company may all be localized within Florida is of little consequence since it is an essential link in movements of equipment and freight to and from distant points on this web of interstate rails. Nor is there any difficulty from an absence of any formalized body of federal law. With judicial inventiveness and resourcefulness the Federal Courts are quite adequate for the task of fashioning an appropriate set of standards. Textile Workers Union of

6. Also named was the General Counsel Adams.

7. § 608.40:
"Every corporation shall have a president, who shall be a director, a secretary and a treasurer. They shall be chosen by the directors and shall serve until their successors are chosen and qualify. * * * "
Added Fla.Laws 1953, ch. 28170, § 1, as amended Fla.Laws 1955, ch. 29886, § 14.
§ 608.51:
"Failure to elect directors or appoint officers on the designated day shall not affect the existence of the corporation. In such case, the incumbents shall hold over until their successors have qualified."
Added Fla.Laws 1953, ch. 28170, § 1.

8. Although clinging tenaciously to the idea of Florida law, asserting that this is a general rule, they cite cases from other jurisdictions and 19 Am.Jur.2d Corporations § 1094; 2 Fletcher, Corporations § 344, at 136 (1954 rev.); 1 Nadler, Florida Corporation Law § 361, at 617.

America v. Lincoln Mills, supra, 353 U.S. at 456–457, 77 S.Ct. at 917–918, 1 L.Ed. 2d at 980–981. Indeed, for one of these very carriers, there is fresh evidence of the capacity and obligation of the Courts to prescribe judicial standards to effectuate the overriding policies of Congress. See Brotherhood· of Ry. & S. S. Clerks v. Florida East Coast Ry., 1966, 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501 affirming United States v. Florida East Coast Ry., 5 Cir., 1965, 348 F.2d 682, which followed this Court's earlier action in Florida East Coast Ry. v. Brotherhood of R. R. Trainmen, 5 Cir., 1964, 336 F.2d 172, cert. denied, 1965, 379 U.S. 990, 85 S.Ct. 703, 13 L.Ed.2d 611.

■■ Approached then as a matter of Federal law, we have no doubt that the contract says what it means, means what it says, and that the law should give effect to it. No holdover doctrine, designed primarily to give continuity to a corporate enterprise in its relation to outsiders, may be applied to leave in office one who has lawfully been discharged. That the discharge could come about through the action of one, or a minority, rather than a majority, relates to the internal management of the affairs of a jointly-owned subsidiary by the owners thereof under the scheme adopted by them. Cf. Chicago, M. & St. P. Ry. v. Minneapolis Civic & Commerce Ass'n, 1918, 247 U.S. 490, 38 S.Ct. 553, 62 L.Ed. 1229; Chicago, M. & St. P. Ry. v. Des Moines Union Ry., 1920, 254 U.S. 196, 41 S.Ct. 81, 65 L.Ed. 219. And the action of the District Judge in opening the switch does not offend the asserted policy denying ordinarily to Courts the power or right to displace corporate officers.[9]

■■ Approval of this action by the District Court does. not, as supposed by Appellants, put a binding imprimatur on the chaos they apprehend will occur when equal antagonists, persisting in their partisan jousting, fail in the required effort of unanimous selection of a successor. Several factors support us. First, there ·is no indication that Past is Prologue. And lest our affirmance be mistakenly read as putting any premium on a dog-in-the-manger intransigence on the part of any one of these parties who have solemnly bound themselves to act unanimously, it is plain that this independence is a powerful right which has to be exercised in the best of good faith. And if any stalemate develops in the ability to select top management, there are ample resources at hand. Not the least of these will be the Interstate Commerce Commission. Since there is a continuing obligation on the part of all of these carriers to fulfill the awesome obligations imposed by the Transportation Act, Brotherhood of Ry. & S.S. Clerks v. Florida East Coast Ry., supra, 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501, the Commission is certainly open to any one or more or all of these parties or public authorities to review, in the light of current conditions, whether Art. 21 is fair, just and reasonable for the future. This might be done either initially or by means of a reference by the District Court under the doctrine of primary jurisdiction. Agricultural Transp. Ass'n v. King, 5 Cir., 1965, 349 F.2d 873; Louisville & N. R. R. v. Knox Homes Corp., 5 Cir., 1965, 343 F.2d 887. In this way the public interest which is surely at stake in the efficient operation and management of critical Terminal facilities will be fully protected.[10]

9. The Appellants cite cases such as Markovitz v. Markovitz, 336 Pa. 145, 8 A.2d 46, 124 A.L.R. 359; 19 Am.Jur.2d Corporations § 1111.

10. The extent to which the Operating and Guaranty Agreement is, or is claimed to be, important to the unimpeded flow of large volumes of interstate rail traffic through the Jacksonville Terminal gateway is revealed by our very recent opinion of June 1966, Brotherhood of R. R. Trainmen v. Atlantic C.L.R.R., 5 Cir., 1966, 362 F.2d 649, in which we vacated an injunction against secondary picketing of Coastline by striking employees of FEC. (See the special supplemental order of the Supreme Court staying our action on conditions, 1966, 384 U.S. 967, 86 S.Ct. 1856, 16 L.Ed.2d 680). Jeop-

■■ This leaves only two further matters. The first is the contention that General Counsel Adams was not an "officer subject to election by the Board of Directors" or a "subordinate official" within the meaning of Art. 21, note 1, supra. Again, we think the District Court was eminently correct in his conclusion that while Mr. Adams continued his association with his law firm and accepted legal employment for many other clients of his busy practice, the circumstances of his retention and long-continued employment by the Terminal Company brought him within the meaning of Art. 21.[11] The other is the cross appeal by FEC seeking attorney's fees under 49 U.S.C.A. § 8.[12] The theory of FEC is that with Coastline and Seaboard declining to recognize the discharge under Art. 21, their persistence in allowing President Jennette to continue in office itself amounts to control and operation of a carrier (the Terminal Company) by two or more carriers in violation of § 5 (4), 49 U.S.C.A. § 5(4), since such operation is not in accordance with the approval under § 5(2) of the Operating and Guaranty Agreement. Without determining whether we would approve denial of attorney's fees for the reasons discussed in Sonken-Galamba Corp. v. Atchison, T. & S. F. Ry., W. D. Mo., 1939, 28 F.Supp. 456; Pacific Gamble Robinson Co. v. Minneapolis & St. L. Ry., D. Minn., 1952, 105 F.Supp. 794; we think the District Judge had considerable discretion. The difference has been deep and spectacular. One side wins. FEC's legal position is sustained, but this is a

long way from making the conduct of Coastline and Seaboard the sort of violation of the Act as contemplated under § 8. We therefore affirm denial of attorney's fees.

And now, hopefully, with this decision the Judge can step down from the locomotive cab so the railroads may run themselves. Florida East Coast Ry. v. Brotherhood of R. R. Trainmen, supra, 336 F.2d at 182.

Affirmed.

---

ardy of the public interest becomes increasingly serious when parties (e. g., FEC), vis-a-vis, Coastline, Seaboard, or both), bound to "unanimous consent," find themselves in a severe competitive struggle for common traffic.

11. The District Court's order, with the complete approval of all parties, recognizes the ethical and professional necessity of an orderly transition of the legal affairs being handled by General Counsel Adams.

12. "In case any common carrier subject to the provisions of this chapter shall do,

cause to be done, or permit to be done any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case."