458 F.Supp. 100 (1978)
TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, Plaintiff,
v.
BROTHERHOOD OF RAILWAY, airline and steamship clerks, freight handlers, express and station employes, Paul W. Jurgens, M. F. Sutberry, J. J. Kosick, T. W. Taggart, Jr., and A. N. Fitzjarrel, Defendants.
No. 78-986C(4).
United States District Court, E. D. Missouri, E. D.
September 28, 1978.
*101 George E. Lee and George P. Mueller, St. Louis, Mo., for plaintiff.
Husch, Eppenberger, Donohue, Elson & Cornfeld, Stephen W. Skrainka, St. Louis, Mo., for defendants.

*102 MEMORANDUM
FILIPPINE, District Judge.
This matter is before the Court on the motion of Terminal Railroad Association of St. Louis (hereinafter TRRA) for preliminary injunction. TRRA seeks to enjoin members of the Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employes (hereinafter BRAC) from picketing TRRA's premises. After consideration of the matter, it is the opinion of the Court that TRRA's motion must be granted.
Employees of the Norfolk and Western Railway Company who are members of BRAC (hereinafter BRAC-N&W) called a strike against Norfolk and Western on July 10, 1978. It is stipulated by the parties that this is a lawful strike resulting from unsuccessful exhaustion of remedies under the Railway Labor Act. BRAC-N&W has sought to expand the strike by establishing picket lines on TRRA premises, which is the primary switching carrier for the St. Louis-East St. Louis gateway. It is agreed by the parties that there is no primary labor dispute between BRAC-N&W and TRRA pursuant to the Railway Labor Act, 45 U.S.C. § 152, First, because BRAC-N&W is not attempting to negotiate terms and conditions of employment with TRRA.
Picketing was commenced by BRAC-N&W at TRRA facilities at 6:00 a. m. on September 20, 1978. After TRRA employees who are members of BRAC refused to cross those picket lines in support of the BRAC-N&W strike against Norfolk and Western, plaintiff sought and was denied a temporary restraining order on September 21, 1978.
A hearing on plaintiff's motion for preliminary injunction was held on September 25 and 26, 1978. TRRA bases its request for injunctive relief on the argument that picketing by BRAC-N&W against an employer with whom it has no primary labor dispute is activity in conflict with the purpose and policy of the Railway Labor Act. Plaintiff asserts that the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq. is not controlling and must be accommodated to the Railway Labor Act. TRRA further argues that because TRRA is not aligned with Norfolk and Western in some substantial manner, there is no economic self-interest on the part of BRAC-N&W members in picketing TRRA, and thus the union's actions fall outside the purview of the Norris-LaGuardia Act and may be enjoined.
Defendants, on the other hand, argue that Norris-LaGuardia is controlling, and the Court is therefore prohibited from issuing any order restraining defendant Union's activities. Defendants also argue that TRRA is substantially aligned with Norfolk and Western.
The Norris-LaGuardia Act, 29 U.S.C. § 104 provides:
"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:"
It is argued by the plaintiff that because there is no labor dispute between BRAC-N&W and TRRA under the Railway Labor Act, there is necessarily no labor dispute for purposes of the Norris-LaGuardia Act. It is the opinion of this Court, however, that the term "labor dispute" has a broader meaning for purposes of Norris-LaGuardia than for the Railway Labor Act, Consolidated Rail Corporation v. BRAC, No. 78-589 (W.D.N.Y. Sept. 23, 1978), and requires further analysis.
Secondary activity such as that in the case at bar constitutes a "labor dispute" within the meaning of the Norris-LaGuardia Act when there is an economic self-interest on the part of the primary employees in taking action against a secondary employer who has in some substantial manner aligned himself with the primary employer. Brotherhood of Railroad Trainmen v. Atlantic Coast Line Railroad, 362 F.2d 649 (5th Cir.), aff'd. 385 U.S. 20, 87 S.Ct. 226, 17 L.Ed.2d 20 (1966). If this standard is not *103 met, there is no labor dispute within the meaning of the Norris-LaGuardia Act, and that Act's restriction on the jurisdiction of the courts to enjoin certain secondary activity does not apply.
The phrase "who has aligned himself in some substantial manner" is of great significance in determining what is a labor dispute within the meaning of Norris-LaGuardia. Secondary picketing, the purpose of which is to coerce a secondary employer to cease doing business with a primary, struck employer is prohibited by the National Labor Relations Act, 29 U.S.C. § 158(b)(4). This provision does not apply to railroads, however, which are governed by the Railway Labor Act. Railroad Trainmen v. Jacksonville Terminal Company, 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969).
The Jacksonville case essentially held that in the absence of standards established by Congress in regard to railroads, secondary picketing is not subject to restraint by the States. The Supreme Court did not say that all secondary activity by railroad unions against railroad employers is legal; neither did it negate the substantial alignment standard articulated in Atlantic. The Court does not interpret the Jacksonville case to read that all secondary activity is protected because it is not proscribed. The requirement that the secondary employer align himself with the primary employer in some substantial manner is essential, for without this parameter, primary employees would be unrestricted in their choice of secondary employers to picket. A union could, in such circumstances, conceivably establish a picket line, which responding employees could honor, on the premises of an employer who had no connection whatsoever with the primary, struck employer. This Court cannot accept these consequences as the intended result of Jacksonville.
The determination of "alignment in some substantial manner" is necessarily a factual inquiry into the circumstances surrounding each case. The Atlantic case indicates that substantial alignment in that case was achieved by Jacksonville Terminal's providing essential services and facilities to the primary employer, the Florida East Coast Railroad (hereinafter FEC) which were related to the normal, day-to-day operations of FEC trains. Supra, at 654, 655. The Court in Atlantic also stated and Jacksonville repeated that the facilities and services provided by Jacksonville Terminal in fact constituted an integral part of the day-to-day operations of FEC.
After a thorough examination by the Court of the facts relative to the relationship between TRRA and Norfolk and Western, it concludes that TRRA has not so aligned itself with Norfolk and Western.
The TRRA, founded in 1889, is the principal switching carrier in the St. Louis-East St. Louis gateway, serving 17 carriers and 281 industries. It is owned by twelve trunkline railroads, the Norfolk and Western among them. Each has a 1/16 interest, except the ConRail (2/16), the Illinois Central Gulf (2/16) and the Missouri Pacific (3/16). There are 17 members of its board of directors. The Norfolk and Western has one director. The 1977 revenue of TRRA was $44,384,000, and it operated at a deficit of $856,000. By prior agreements, the TRRA is authorized to issue upon its owners sight drafts representing loans or advances to meet its expenses. The TRRA currently owes its owners approximately $7,000,000 because of previous sight drafts. Approximately 98% of TRRA's business comes from various trunkline railroads, most of which are part owners. The remaining 2% involves traffic that has both its origin and destination within TRRA's tracks. TRRA owns 33 miles of main line track and approximately 300 miles of connecting lines.
Since the economic self interest test must be primarily a factual inquiry, Atlantic, supra at 659, the circumstances in the provision of services and facilities at the Jacksonville Terminal, the subject of the protracted litigation culminating in the Jacksonville decision, will serve as a point of reference and comparison.
The Atlantic case found that the Terminal Company in that situation was aligned *104 in some substantial manner with FEC. The Jacksonville terminal was jointly owned and controlled by four rail carriers, including FEC, which enjoyed the common use of services and facilities and shared equally in the actual operation of the terminal. Each of the railroads had their employees on the premises and these employees were jointly responsible for the day-to-day operation of the terminal. In this situation, TRRA property is under TRRA's sole ownership. Only TRRA employees report to work on Terminal property. No Norfolk and Western employees report to work on Terminal property. Here also, the operations of TRRA are conducted by its own employees.
The Jacksonville Terminal Company employees provided various other services necessary to the FEC operations including maintenance of FEC cars and locomotives, track maintenance, switching of cars and signalling. Furthermore, both courts in the Atlantic and Jacksonville decisions discussed the extraordinary strategic location of the terminal and its indispensable character to the entirety of FEC operations. The Jacksonville Terminal was a common situs at which work essential to the operation of the FEC was performed. The Court found that "the facilities and services provided by the Terminal Company in fact constitute[d] an integral part of the day-to-day operations of the FEC . . ." (emphasis in original). Jacksonville, supra 394 U.S. at 373, 89 S.Ct. at 1112, quoting Atlantic, supra at 651.
In the instant case, the evidence shows a different relationship between Norfolk and Western and TRRA. While TRRA does some blocking and classification of cars, it does no repairs on locomotives. Furthermore, it does no repair work on cars other than that which is required under the safety regulations of the Federal Railroad Administration and the Interchange Rules of the Association of American Railroads. These "running repairs" are performed by all railroads on cars in their possession only when necessary for the safe movement of traffic and the costs are billed to the owners of the various cars. The situation in the present case shows much less involvement between the Norfolk and Western and TRRA, therefore, than was found between the FEC and Jacksonville Terminal. TRRA does basically only that which is required to move traffic safely through the St. Louis-East St. Louis gateway. It should also be noted that, as is common practice in the railroad industry, agreements exist involving TRRA and Norfolk and Western (and in some instances other railroads as well) concerning trackage rights, traffic control, and safety management. The Court also notes that the parties at the hearing stipulated that TRRA is not a member of the strike insurance program which is currently benefiting Norfolk and Western. (The stipulation further indicated that all owners of TRRA, with the exception of ConRail and Rock Island, are members of that agreement.)
If the facts indicating the relationship between TRRA and Norfolk and Western form the basis for an alignment in a substantial manner between them, then it is difficult to conceive how any major railroad would not be substantially aligned with any other railroad.
The Norfolk and Western operates in 14 states and Ontario. It moved 16,078,733 cars last year, of which 4,204,508 were interchanged in all locations. Of this number, 152,593 were interchanged by the TRRA. This accounts for less than 1% of the Norfolk and Western traffic business. Under this analysis, the relationship is less than substantial. This numerical analysis is, however, not the only way of facing the problem. As noted above, the percentage of business is not solely determinative of the extent of the relationship between the two employers.
On the other hand, defendants argue that any connection, even one that is de minimus, serves as a basis for finding an alignment in some substantial manner that would result in the proper invocation of the Norris-LaGuardia Act. In other words, defendants ask this Court to find that any relationship whatsoever meets the standard set forth in Atlantic. Such an analysis, *105 however, would provide for the possibility of a significant shutdown of the nation's entire railway system and businesses that depend upon it whenever there is a local labor dispute within the meaning of the Railway Labor Act.
Another way to determine whether the secondary employer could be considered to be part of the labor dispute between the primary employer and its employees might exist when it is found that the secondary employer has taken on new duties after the commencement of the strike. See Consolidated Rail Corp. v. BRAC, No. 78-589 (W.D.N.Y. Sept. 23, 1978). Under this determination it becomes clear that, regardless of the prior business involvement, it is the helping relationship (the alliance) created between employers in order to minimize the effect of the strike that is determinative.
In the present case, BRAC has argued that such alliance exists and that this Court should therefore find that the TRRA and the Norfolk and Western are aligned in a substantial manner. The evidence, however, does not support such a finding.
The evidence indicates that prior to 1975 certain cars of the Norfolk and Western were blocked at TRRA's Madison Yard and transported to Norfolk and Western's Pontoon Road connection instead of being delivered to the Luther Yard. This practice was discontinued in 1975 because of insufficient traffic.
Testimony further indicated that sometime after the commencement of the strike on July 10, 1978, TRRA assumed a greater share of the blocking of Norfolk and Western cars and delivered these to the Pontoon Road connection. Additionally, testimony revealed that an official of Norfolk and Western went to the Madison Yard of TRRA and requested waybills and copies of routing printouts and took them to the yardmaster. A TRRA employee filed a time claim sometime prior to the end of August because of it.
On August 31, 1978, at the request of BRAC officials, a meeting was held between them and a representative of TRRA. BRAC testimony indicated that both of the above matters were complained of.
The evidence is uncontradicted that BRAC representatives indicated that if the practices complained of were discontinued, there would be no picketing of TRRA. No notices of any type were sent prior to, or as a result of, the meeting and discussion.
As to conditions and operation subsequent to the August meeting concerning these matters, the most convincing testimony was that of the TRRA Clerk for the Madison Yard who was presented by defendants. He indicated that subsequent to the August meeting, the blocking procedures at the Madison Yard were significantly the same as they had been prior to July 10, 1978, and all cars were delivered to Luther Yard, with none going to the Pontoon Road connection. This continues unchanged to the present. Additionally, the Clerk testified that the Norfolk and Western official has never returned.
Because this Court finds that the activity complained of was terminated when requested, and because of the disagreement regarding the propriety and history of that activity between Norfolk and Western and TRRA, it cannot be said that this incident is sufficient to establish an alignment between the two railroads under this alternative analysis.
Having concluded that TRRA has not aligned itself with Norfolk and Western in some substantial manner, the Court finds that the secondary activity in question does not constitute a labor dispute, and BRAC-N&W and TRRA are not disputants, within the meaning of the Norris-LaGuardia Act. The Court, therefore, is not without jurisdiction to restrain the secondary picketing of TRRA by BRAC-N&W, or by BRAC members who are TRRA employees.
Plaintiff argues that BRAC-N&W's activity in regard to TRRA is fundamentally at odds with the purpose and policy of the Railway Labor Act. The Court must agree. 45 U.S.C. § 151a(1) provides that the purpose of the Railway Labor Act is "[t]o avoid any interruption to commerce or to the *106 operation of any carrier engaged therein." The picketing by BRAC-N&W and the honoring of those lines by TRRA employees has resulted in an almost total cessation of movement through TRRA tracks and yards. TRRA facilities serve seventeen railroads at 28 interchange points, and 281 industrial customers. The economic effect on TRRA, other railroads, the industrial customers, and the public at large is overwhelming.
Further, the primary dispute over wages, terms and conditions of employment, and job security is between Norfolk and Western and BRAC-N&W. It is not between BRAC-N&W and TRRA. An additional purpose of the Railway Labor Act is to provide for the prompt and orderly resolution of such primary disputes. 45 U.S.C. 151a(5). Secondary picketing which is honored by responding employees of an employer not aligned in some substantial manner with the primary employer is hardly within the intent of the Railway Labor Act. The Court therefore finds that the picketing of TRRA by members of BRAC-N&W, and the joining of such picketing by TRRA employees who are members of BRAC is in clear contravention of the letter and spirit of the Railway Labor Act.
Certain standards are required for obtaining preliminary injunctive relief. Missouri Portland Cement Company v. H. K. Porter, 535 F.2d 388 (8th Cir. 1976). Plaintiff here has met the burden of showing that there is substantial probability of success at trial and that there would be irreparable injury to TRRA absent such issuance. Moreover, in weighing the interests of both sides, the Court further finds that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to the defendants, and that the granting of the preliminary injunction will not disserve the public interest.
Therefore, because the activities in question do not constitute a dispute within the meaning of the Norris-LaGuardia Act due to the absence of alignment of TRRA with Norfolk and Western in some substantial manner, because these are activities in contravention of the mandates of the Railway Labor Act, and because TRRA has met the proper standard for obtaining preliminary injunctive relief, it is the opinion of the Court that TRRA's motion for preliminary injunction must be, and is, granted.