UNITED STATES of America, Plaintiff,

v.

SEA–LAND SERVICE, INC., Defendant.

Civ. A. No. 74–1664.

United States District Court,
D. New Jersey.

Jan. 13, 1977.

Jonathan L. Goldstein, U.S. Atty., Newark, N.J., by Warren A. Schneider, U.S. Dept. of Justice, Admiralty and Shipping Sec., New York City, Carol J. Neustadt, Federal Maritime Com'n, Washington, D.C., for plaintiff.

Meyner, Landis & Verdon by Jeffrey L. Reiner, Newark, N.J., Ragan & Mason by Gerald A. Malia, Washington, D.C., for defendant.

## OPINION

MEANOR, District Judge.

This is a civil action wherein the United States seeks to recover a civil penalty for certain acts of the defendant which are alleged to violate (1) the terms of its tariff on file with the Federal Maritime Commission (FMC), and (2) a suspension order issued by the FMC.

Sea-Land Service (SLS) is a common carrier by water. Before and during the relevant dates at issue it provided, among other services, containership services between Elizabeth, New Jersey, and Puerto Rico. This action concerns SLS's activities with certain "consolidators," or non-vessel-owning common carriers.

Consolidators are in the business of receiving small or less than container-load shipments from shippers, consolidating such shipments and "stuffing" them into containers furnished by carriers, and then forwarding the loaded containers to the carrier's terminal for ultimate transportation. SLS was a furnisher of such containers, and provided containership service according to tariff provisions filed by SLS with the FMC which were in effect at all times relevant herein. Typically, consolidators are not located on the waterfront, and containers, full or empty as the case may be, are conveyed by land transportation between the consolidation site and the docks.

Consolidation activities became a concern to the International Longshoremen's Association (ILA) which viewed the inland consolidation work as properly belonging to ILA members at the waterfront. In January 1973, the ILA met with the association representing SLS and other carriers, and an agreement was reached wherein the carriers agreed not to supply containers to consolidators' facilities within 50 miles of a port unless such facilities were located on a pier where vessels normally dock. The carriers further agreed to pay penalties for containers furnished in contravention of the agreement.

On March 15, 1973, SLS commenced observance of the above agreement and denied containers to consolidators within a 50-mile radius. On the same date, SLS filed proposed amendments to its tariff with the FMC which were scheduled to become effective on April 14, 1973. The proposed amendments included the terms of the agreement made with the ILA. The amendments also included a provision authorizing SLS to pass on any penalty it incurred by supplying containers in breach

of the ILA agreement to the consolidator receiving the containers.

On April 13, 1973, the FMC ordered an investigation into the lawfulness of the submitted tariff amendments, and also ordered the suspension of the amendments until August 13, 1973. The order did not suspend the tariff in effect prior to the submission of the amendments.

During the period between April 13 and August 14, 1973, SLS complied with the terms of the ILA agreement. Actual requests for containers which SLS refused to honor during this period, as reflected in the record before me, appear to be limited to five requests by a single consolidator, Consolidated Express, Inc. The record also reflects that during the first six months of 1973, SLS was assessed, and it paid, $102,-000 in penalties for alleged violations of the ILA agreement. These penalties were not passed on to the individual consolidators involved. The parties have stipulated that in refusing to supply containers, SLS acted not in reliance on the tariff provisions which had been suspended by the FMC, but rather on its labor agreement and on its tariff which predated the amendments and the suspension order.

On July 12, 1973, the consolidators' association filed a petition with the FMC alleging that SLS had not complied with the suspension order, and sought to have that order enforced. The FMC, realizing that the suspension order had effect for only one more month, and also aware that the NLRB was about to seek an injunction against the future observance of the ILA agreement, pursued no judicial relief at that time.[1]

On November 20, 1973, the FMC gave notice to SLS of a claim and demand for recovery of $120,000 for 120 or more alleged violations of its April 13 suspension order. On October 24, 1974, the United States instituted this action against SLS asserting a claim for alleged violations of § 2 of the Intercoastal Shipping Act, 46 U.S.C. § 844, and § 32 of the Shipping Act, 46 U.S.C. § 831.

## I

46 U.S.C. § 844 requires all common carriers by water in intercoastal commerce to file tariffs with the FMC, and provides that no common carrier shall

deny to any person any privilege or facility, except in accordance with

said tariffs. This provision goes on to state that

(w)hoever violates any provision of this section shall be subject to a civil penalty of not more than $1,000 for each day such violation continues.

46 U.S.C. § 831(c) provides that

(w)hoever violates any order, rule, or regulation of the Federal Maritime Commission made or issued in the exercise of its powers, duties, or functions, shall be subject to a civil penalty of not more than $1,000 for each day such violation continues.

In its complaint, the United States has charged that the defendant's compliance with the ILA agreement, despite the FMC suspension order during the 151-day period from March 15, 1973 to August 13, 1973, constitutes a violation of both of the above statutory provisions, and renders the defendant liable for a penalty of $151,000.

## II

I find it unnecessary to go to the question of whether the defendant is liable for any penalty under 46 U.S.C. § 831 predicated on a violation of the FMC suspension order. For reasons stated below, I find that the defendant has violated the terms of its tariff filed with the FMC. This alone is sufficient to justify the imposition of a penalty in this case.

I do not believe that Congress intended by adoption of both 46 U.S.C. § 831 and § 844 to render a carrier subject to liability for double penalties on facts such as presented in this case. From my reading of the complaint herein, which appears to set

---

1. The ILA agreement was ultimately enjoined by the NLRB on December 4, 1975, and that action has been affirmed by the Second Circuit. *ILA v. NLRB*, 537 F.2d 706 (2d Cir. 1976).

forth alternative theories for but a single recovery, the United States would seem to agree. Furthermore, I believe that the sole effect of the April 13 suspension order was to negate the viability of the proposed tariff amendments which the defendant had filed in March. This order created no affirmative duty on the part of the defendant in addition to those which otherwise existed by virtue of the defendant's tariff which predated the amendments, and which was unaffected by the suspension order. As such, the issue of liability in this case appropriately rests on the question of whether the acts of the defendant constitute a breach of the terms of its tariff in violation of 46 U.S.C. § 844, and not whether these acts violated the FMC suspension order.

### III

■ Preliminarily, it should be noted that the obligation of common carriers to provide services is one which is rooted in our early common law. *American Trucking Ass'ns, Inc. v. Atchison, T., & S. F. Ry.*, 387 U.S. 397, 406, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967). This duty runs not only to shippers, but to the public. As such, a carrier owes the public a continuing duty to exercise reasonable efforts to maintain services, even when beset by labor controversies. *Railway Employees v. Florida East Coast Ry.*, 384 U.S. 238, 245, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966). Congress has found it appropriate to codify this common law duty with respect to intercoastal carriers by requiring them to file tariffs with a regulatory agency, and subjecting them to suit by the United States for civil penalties if they should deny services in derogation of these tariffs. 46 U.S.C. § 844.

Item 570 of the defendant's tariff (Section 1–1st revised page 124), entitled "REMOVAL OF CARRIER'S TRAILER BY SHIPPER OR CONSIGNEE FOR LOADING OR UNLOADING" controls the instant action. It provides in part:

When prior arrangements have been made with the carrier, trailers may be removed from the terminals of the carrier, by Shipper or Consignee for loading and unloading . . ..

The defendant has maintained that the "prior arrangements" language of this provision affords a certain measure of discretion in whether it is obligated to comply with requests for containership services. The parties have stipulated that such requests would be declined under this provision for the following reasons:

A) lack of container at the particular time,

B) vessel capacity,

C) failure of customer to pay previous charges, and

D) lack of labor.

Statement of Facts not in Dispute, paras. 44, 45. Defendant argues that if it had supplied containers in violation of the ILA agreement, a general strike by the ILA, which could have closed the port, might have ensued. This threat, defendant urges, justified its denial of containers in adherence to its labor agreement. I find this position to be untenable.

■ Any ambiguity in a tariff must be construed against the carrier since the carrier drafted the tariff. *Chicago & N. W. Ry. v. Hunt-Wesson Foods*, 504 F.2d 905, 908 (7th Cir. 1974); *Penn Cent. Co. v. General Mills, Inc.*, 439 F.2d 1338, 1341 (8th Cir. 1971). It is entirely reasonable, and consistent with the general policy aimed at assuring the public adequate carrier service, to construe Item 570 of defendant's tariff as vesting no discretion in the defendant to deny consolidators requested containership services, within the bounds of reasonable possibility. A carrier is not required to perform the impossible. "(T)he law, of course, exacts only what is reasonable from a carrier." *Minneapolis & St. L. Ry. v. Pacific Gamble Robinson Co.*, 215 F.2d 126, 134 (8th Cir. 1954). It is evident from the facts of this case that the defendant, in denying containership services, was not constrained by factors which rendered its performance impossible. The parties have stipulated that prior to March 1973, defendant had routinely made containers available to consolidators. Statement of

Facts not in Dispute, para. 30. They have also stipulated that notwithstanding defendant's present assertion that Item 570 of its tariff vests it with discretion to deny containership services, this provision had never been exercised with regard to Consolidated Express, Inc. before March 1973. *Id.*, para. 32. It is evident that the defendant denied containership services solely in reliance on its labor agreement and the belief that its tariff authorized such conduct. Inasmuch as a labor agreement cannot relieve a carrier from performing its duties, even where there exists the threat of a strike, *Montgomery Ward & Co. v. Northern Pac. Terminal Co.*, 128 F.Supp. 475, 516 n.92 (D.Ore.1953), that belief was unfounded. I, therefore, find that by denying containership services to consolidators, the defendant failed to observe the provisions of its tariff then in effect, in violation of 46 U.S.C. § 844.[2]

IV

■■■ The next issue to be resolved is whether the acts of the defendant constitute a continuing violation of 46 U.S.C. § 844 so as to render it liable for daily penalties for the 151-day period in question, or whether these acts constitute a series of periodic violations rendering it liable for a penalty for each documented act of refusing to supply requested containers. Precisely what constitutes a continuing violation within the meaning of 46 U.S.C. § 844 has not been judicially determined. This question has been dealt with in the context of another civil penalty statute, 15 U.S.C. § 45(*l*), which penalizes violations of Federal Trade Commission cease and desist orders. In *United States v. ITT Continental*

*Baking Co.*, 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975), the Supreme Court held that the acquisition by the defendant of the assets of certain businesses in violation of a FTC order constituted a continuing violation of 15 U.S.C. § 45(*l*) so long as the assets were retained. In dictum, the court indicated that continuing violations would also include continuing conspiracies to fix prices or control production, maintenance of a billboard in defiance of an order prohibiting false advertising, failure to dissolve an illegal merger, and failure to eliminate an interlocking directorate. *Id.* at 231. Each of these violations injure the public and inure to the benefit of the violator until an act of abatement is taken. On the other hand, it has been held that there is no continuing violation in a situation involving price discrimination by means of illegal discounts, where each discriminatory transaction was an independent and separately identifiable act. *FTC v. Consolidated Foods Corp.*, 396 F.Supp. 1353 (S.D.N.Y. 1975).

I find the facts of this case to be more akin to the situation in *Consolidated Foods* than to the examples listed by the Supreme Court in *ITT Continental Baking*. The parties herein have stipulated that actual requests for containers which the defendant failed to honor consist of "approximately five telephone calls, confirmed by telegrams, by Consolidated Express, Inc. for one or two containers." Statement of Facts not in Dispute, para. 38. The parties have also stipulated that during the first six months of 1973 the defendant paid $102,000 in penalties allegedly for providing containers to consolidators in violation of the ILA agreement. *Id.*, para. 21. In my

---

**2.** This finding is not disturbed by the fact that at the time relevant to this case Consolidated Express, Inc. may or may not have been engaged in consolidation activities without an appropriate license from the Interstate Commerce Commission. There may be situations where a carrier with actual knowledge of wrongdoing by a shipper may be justified or obligated to withhold carrier services. *See*, e.g., *North Am. Van Lines, Inc. v. Heller*, 371 F.2d 629 (5th Cir. 1967) (where carrier had actual knowledge that one tendering goods for shipment was not in rightful possession of such goods, carrier was not bound to receive the property for shipment). There is no evidence in the instant case that the defendant had such actual knowledge of possible wrongdoing by Consolidated Express, Inc. at the time it withheld requested containers, nor any evidence that if it had such knowledge, it denied containers in reliance thereon. To the contrary, the defendant has stipulated that it denied containers in reliance on its labor agreement and its tariff on file with the FMC.

mind, this is sufficient to indicate that each decision to supply or withhold requested containers was an independent act. I, therefore, find no continuing violation of 46 U.S.C. § 844 on the facts of this case. I find that each of the five occasions to which the parties have stipulated that the defendant denied containers to Consolidated Express, Inc. constitutes a single violation of 46 U.S.C. § 844.

V

The amount of penalties to be assessed for each violation by the defendant is a matter within the court's discretion. Factors commonly taken into account in assessing civil penalties include the good or bad faith of the violator, the ability of the violator to pay, the degree of public injury engendered by the violations, and the degree to which the violator profited from his acts. See *FTC v. Consolidated Foods Corp., supra,* 396 F.Supp. at 1356–57. However, civil penalty statutes should be applied in a manner which promotes their deterrent effect. See *United States v. ITT Continental Baking Co., supra,* 420 U.S. at 231–32, 95 S.Ct. 926. Indeed, when the punitive provision of 46 U.S.C. § 844 was amended in 1972 to provide for civil rather than criminal penalties, Congress sought to maximize the deterrent value of the statute. S.Rep.No. 1014, 92 Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Adm.News 3121. Taking the above factors into account, I find it appropriate to assess the defendant a penalty of $1,000 for each of its five violations. Judgment is, therefore, rendered in favor of the United States in the amount of $5,000.

The United States should submit an appropriate order.