625 F.2d 1357
 104 L.R.R.M. (BNA) 3105, 89 Lab.Cas. P 12,179
 ASHLEY, DREW & NORTHERN RAILWAY COMPANY, Appellee,
v.
UNITED TRANSPORTATION UNION AND ITS AFFILIATED LOCAL NO.
1121; Bobby G. Hall; Harold L. Rhoads; J. R. Tice and H. G.
Kenyon, Individually and as Representative of United
Transportation Union & Local No. 1121, Appellants.
 No. 79-1886.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 17, 1980.
Decided July 9, 1980.
 
 Pamela D. Walker, Little Rock, Ark., for appellants.
 Walter A. Paulson, Little Rock, Ark., argued, for appellee; James W. Moore and Oscar E. Davis, Jr., Little Rock, Ark., on brief.
 Before STEPHENSON, Circuit Judge, KUNZIG,* Court of Claims Judge, and McMILLIAN, Circuit Judge.
 STEPHENSON, Circuit Judge.
 
 
 1
 United Transportation Union (UTU)[1] appeals from a preliminary injunction restraining it from picketing Ashley, Drew & Northern Railway Company (AD&N). The district court[2] issued the injunction on the ground that UTU was engaged in secondary picketing outlawed by the Railway Labor Act. The principal issues on appeal are (1) whether the district court had jurisdiction to issue the injunction, and, if so, (2) whether issuing the injunction was an abuse of discretion. A threshold issue is whether the appeal is moot inasmuch as the strike underlying the picketing has ended. We reach the merits and affirm the action of the district court.
 
 I. Background
 
 2
 Appellee AD&N sought injunctive relief when UTU, on strike against the Chicago, Rock Island & Pacific Railroad Company (hereinafter Rock Island), began to picket AD&N and induce its employees to leave their jobs. This picketing was in response to AD&N's use of managerial personnel to move the freight of an affiliated railroad in Rock Island's railroad yard at Fordyce, Arkansas. AD&N has about seventy-five employees, some of whom belong to UTU. But, at the time the picketing occurred, UTU and AD&N had no dispute over the pay or working conditions of AD&N employees.
 
 
 3
 The material facts are not in dispute. AD&N is owned by the Georgia-Pacific Company, which makes wood-based products. AD&N operates on about forty miles of track between the Arkansas towns of Monticelli and Crosset. AD&N serves several customers along this route. Its principal customers are the Georgia-Pacific processing plants around Crosset.
 
 
 4
 About fifty miles from Crosset is Fordyce, where Georgia-Pacific owns and operates both a mill and a one-engine, two-man railroad, the Fordyce & Princeton Railway Company (F&P). F&P leases freight cars from other railroads and transports them over the half-mile track between the mill and the railroad yard at Fordyce. During the relevant period, this yard was owned by Rock Island, which leased facilities to F&P and to the St. Louis Southwestern Railway Company (hereinafter Cotton Belt). By a trackage agreement, Rock Island permitted F&P and Cotton Belt to use specified Rock Island track "for the purpose of effecting interchange with each other." UTU was not a signatory to this agreement.
 
 
 5
 Before the Rock Island strike, F&P would deliver carloads of processed wood to the Fordyce yard and take empty cars back to the mill. Rock Island or Cotton Belt employees would deliver empty cars to the yard. Rock Island employees would pick up loaded cars to be routed via Rock Island, Cotton Belt employees would pick up cars to be routed via Cotton Belt. About 150 cars were interchanged each day in the Fordyce yard, with F&P's interchanges accounting for about fifteen to twenty of that number.
 
 
 6
 In late August of 1979, UTU, after exhausting conciliation proceedings required by the Railway Labor Act, began a lawful strike against Rock Island and posted pickets at Rock Island's Fordyce depot. This depot was beside the Rock Island track that linked F&P with the Cotton Belt and Rock Island lines. Although not themselves on strike, Cotton belt employees refused to cross UTU's picket line to interchange cars between Cotton Belt and F&P. F&P's employees similarly refused.
 
 
 7
 In response to this development, AD&N and F&P which had common management dispatched three or four AD&N officers from Crosset to move the F&P freight.[3] From August 31 to September 5, AD&N officers operated the F&P locomotive to move cars over the Rock Island track specified in the Rock Island-Cotton Belt-F&P trackage agreement. Sometimes, because of congestion on this track, the AD&N officers used Rock Island's main track to effect the interchange. The officers also transferred to Cotton Belt some cars that would have been carried by Rock Island in the absence of a strike. The officers did not advance Rock Island freight cars for the benefit of any other Rock Island customer; their aim was to maintain F&P's rail service for Georgia-Pacific's Fordyce mill.
 
 
 8
 After recognizing that the workers crossing picket lines at Fordyce were AD&N personnel, UTU sent members to picket the AD&N line near Crosset. At 6:45 p. m. on September 5, UTU members bearing picket signs accosted an AD&N train leaving Crosset. AD&N employees responded by abandoning the train. At 11:30 p. m. additional UTU pickets appeared at the main entrance of Georgia-Pacific's Crosset plant complex. The effect of these picket lines was that about sixty of AD&N's seventy-five employees chose to stay off the job. The remaining employees, supplemented by management personnel, could perform no more than twenty-five percent of AD&N's regular rail service.
 
 
 9
 Continual use of the AD&N line was critical to operation of Georgia-Pacific's Crosset plants. Each day, AD&N brought in seventy carloads of raw materials to Crosset and carried out a like amount of finished product. No alternative form of shipment was reasonably available. Because the Crosset plants had few storage facilities, a one or two-day delay in either outgoing or incoming rail shipments would force the plants to shut down. In that event, about 3,000 employees would be out of work. The district court found that trade and public revenues in the surrounding areas would suffer by the loss of millions of dollars per month in wages.
 
 
 10
 On September 6, the day after UTU's picketing against AD&N began, AD&N posted a $25,000 indemnity bond and secured a temporary restraining order against the picketing. This order remained in effect until September 14, when it was superseded by the district court's preliminary injunction. In issuing the injunction, the court held that AD&N had met its two-fold burden of establishing the potential for irreparable harm absent immediate injunctive relief and a likelihood of success on the merits. As to the latter, the court ruled that UTU's secondary picketing against AD&N was prohibited by the Railway Labor Act and not protected by the anti-injunctive provisions of the Norris-LaGuardia Act.[4] Important to both rulings was the court's finding that there was no "substantial alignment" between AD&N and Rock Island: the court found that AD&N and F&P were only continuing their rail service for Georgia-Pacific, not aiding Rock Island in the strike.
 
 II. Mootness
 
 11
 Federal jurisdiction extends only to actual cases and controversies, U.S.Const. art. 3, § 2, and the case or controversy "must exist at stages of appellate * * * review, and not simply at the date the action is initiated." Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973). See SEC v. Medical Committee for Human Rights, 404 U.S. 403, 405-07, 92 S.Ct. 577, 579-580, 30 L.Ed.2d 560 (1972). Noting that the UTU-Rock Island strike ended while this appeal was pending, AD&N contends that the termination of the strike deprived UTU of any present interest in the outcome on appeal and argues that UTU's appeal should therefore be dismissed as moot.
 
 
 12
 We cannot agree. As the party seeking extraordinary injunctive relief, AD&N was required to post a bond to indemnify UTU for any loss UTU might sustain as a result of being wrongfully enjoined or restrained. See Fed.R.Civ.P. 65(c). Because UTU has a continuing monetary stake in demonstrating that injunctive relief should not have been issued, its appeal is not moot. See Liner v. Jafco, Inc., 375 U.S. 301, 305-06, 84 S.Ct. 391, 394-395, 11 L.Ed.2d 347 (1964); Associated General Contractors v. International Union of Operating Engineers Twin City Local No. 49, 519 F.2d 269, 271-72 (8th Cir. 1975). See generally American Bible Society v. Blount, 446 F.2d 588, 594-96 (3d Cir. 1971).[5] We turn to the merits.
 
 III. Jurisdiction to Issue Injunctive Relief
 
 13
 UTU attacks the district court's jurisdiction on two alternative grounds. First, UTU contends that this case involved or arose out of a "labor dispute" either between UTU and Rock Island or between UTU and AD&N within the meaning of the Norris-LaGuardia Act, 29 U.S.C. §§ 101-115. Accepting that contention would mean that the district court was affirmatively deprived of any jurisdiction it otherwise might have had to issue injunctive relief. Second, UTU contends that, even should Norris-LaGuardia not apply, AD&N had no federal right of action for injunctive relief. We reject both contentions and conclude the district court had jurisdiction to issue an injunction.
 
 A. Effect of the Anti-Injunction Act
 
 14
 The Norris-LaGuardia Act of 1932 generally removes the jurisdiction of federal courts to issue injunctive relief in "any case involving or growing out of any labor dispute," 29 U.S.C. § 101. Injunctive relief against secondary picketing in such a case is either absolutely barred, see 29 U.S.C. § 104(a), (e) & (i), or is available only under special circumstances which were not shown here, see 29 U.S.C. §§ 107, 108. Applicability of the Act's anti-injunction proscription therefore depends solely on whether this was a case involving or arising out of a labor dispute within the meaning of the Act.[6]
 
 
 15
 Section 13(c) of the Act, 29 U.S.C. § 113(c), defines "labor dispute" as "any controversy" concerning either "terms or conditions of employment" or "representation" of persons in negotiating "terms or conditions of employment." A "labor dispute" exists under section 13(c) "regardless of whether or not the disputants stand in the proximate relation of employer and employee." The "labor dispute" in this case was that which existed between UTU and Rock Island. We reject UTU's contention that another "labor dispute" existed between it and AD&N. UTU's only asserted dispute with AD&N was over the latter's use of managerial personnel to move F&P freight over Rock Island track in Fordyce. This controversy concerned neither the representation of AD& N employees nor their terms or conditions of employment. Cf. Milk Wagon Drivers' Union, Local 753 v. Lake Valley Farm Products, Inc., 311 U.S. 91, 96-97, 61 S.Ct. 122, 124-25, 85 L.Ed. 63 (1940) ("labor dispute" exists between non-struck employer and picketing union where picketing is aimed at compelling employer's employees to join union for purpose of improving their pay and working conditions).
 
 
 16
 Application of the Norris-LaGuardia Act thus depends on whether this case "involves or arises out of" the only possibly relevant labor dispute that between UTU and Rock Island. Section 13(a) of the Act provides:
 
 
 17
 (a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a "labor dispute" (as defined in this section) of "persons participating or interested" therein (as defined in this section).
 
 
 18
 29 U.S.C. § 113(a). UTU contends we should read this expansive language literally and rule that the present case is a case involving or growing out of a labor dispute on the basis that UTU and AD&N "are engaged in the same industry * * * or have a direct or indirect interests therein." Most courts considering the scope of section 13(a), however, have not relied on a literal reading. Instead, these courts have come to results in accord with the following test: when a non-struck employer seeks to have a union's activities enjoined by a federal court the case involves or grows out of a labor dispute and thus the Norris-LaGuardia anti-injunction provisions apply only when the offending activity is furthering the union's economic interest in a labor dispute. E. g., Brotherhood of Railroad Trainmen v. Atlantic Coast Line Railroad, 362 F.2d 649, 654-55 (5th Cir.), aff'd by an equally divided court, 385 U.S. 20, 87 S.Ct. 226, 17 L.Ed.2d 20 (1966) (labor dispute involved; secondary picketing not enjoinable where union "attempts to bring secondary pressure upon the employer with whom its primary dispute exists by means of (picketing) secondary employer, who has aligned himself with the primary employer in some substantial manner"); Lakefront Dock & Railroad Terminal Co. v. ILA, 333 F.2d 549, 553 (6th Cir. 1962) (labor dispute not involved; sympathy strike enjoinable where longshoremen's union honoring picket line of seafarers' union claims no economic interest in dispute between picketing seafarers' union and owner of ship berthed at longshoremen's dock); Amalgamated Association of Street Employees v. Dixie Motor Coach Corp., 170 F.2d 902 (8th Cir. 1948) (labor dispute involved; court could not enjoin picketing of plaintiff's bus depot where plaintiff provides facilities to struck bus company); Western Maryland R.R. Co. v. System Board of Adjustment, 465 F.Supp. 963, 973 (D.Md.1979) (labor dispute not involved; union on strike against primary railroad enjoined from picketing facilities of secondary railroads which do not interchange cars with primary railroad); Southern Railway v. Brotherhood of Railway Clerks, 458 F.Supp. 1189, 1191-92 (D.S.C.1978) (labor dispute involved; secondary picketing not enjoinable where non-struck plaintiff railroad interchanging with struck railroad also participates in strike insurance plan with struck railroad); Terminal Railroad Association v. Brotherhood of Railway Clerks, 458 F.Supp. 100, 102-05 (E.D.Mo.1978) (labor dispute not involved; secondary picketing enjoinable because facts do not show substantial alignment between non-struck plaintiff railroad and struck railroad); Consolidated Rail Corp. v. Brotherhood of Railway Clerks, 84 Lab.Cas. (CCH) P 10,924 at 19,586-588 (W.D.N.Y.1978) (labor dispute not involved; picketing of non-struck railroad's solely-owned facilities enjoinable; isolated instances of plaintiff's supervisors performing work for struck railroad do not constitute substantial alignment); Alton & Southern Railway v. Brotherhood of Railway Clerks, 84 Lab.Cas. (CCH) P 10,835 at 19,256-57 (D.D.C.), aff'd, (D.C. Cir. Sept. 15, 1978), cert. denied, 439 U.S. 996, 99 S.Ct. 597, 58 L.Ed.2d 670 (1978) (labor dispute involved; picketing and sympathy strike not enjoinable because non-struck railroad has common interest with struck railroad by virtue of railroads' participation in strike insurance plan); Illinois Central Railroad v. International Brotherhood of Teamsters Local 568, 90 F.Supp. 640, 643-45 (W.D.La.1950) (labor dispute not involved; picketing of non-struck railroad enjoinable where railroad's sole connection with union-gravel company dispute is railroad's service performed for company at point "substantially removed from" company's plant); Pacific Gamble Robinson Co. v. Minneapolis & St. Louis Railway, 85 F.Supp. 65, 66 (D.Minn.1949) ("(t)he purpose of the statute is to affect labor matters, not merely an interest in an industry, regardless of its relation to labor matters. Moreover, both parties must possess the required interest. Otherwise no relationship to a labor dispute would exist between the two."); Gomez v. United Office & Professional Workers Local 16, 73 F.Supp. 679, 681-82 (D.D.C.1947) (labor dispute not involved; picketing of plaintiff dance studio enjoinable where plaintiff has "no financial interest in and does not exercise control over" struck dance studio and where union has no interest in representing plaintiff's employees); Donnelly Garment Co. v. ILGWU, 20 F.Supp. 767, 770-72 (W.D.Mo.1937) (nonsensical result of reading section 13(a) literally means that it must be read in conjunction with section 13(c)'s definition of "labor dispute"). See In re Brotherhood of Railway Clerks, 605 F.2d 1073, 1075 (8th Cir. 1979) (absent findings of economic relationship between picketed non-struck railroad terminal and struck railroad, there was no basis for determining whether district court was entitled to grant relief for the terminal under the Norris-LaGuardia Act). See also Columbia River Packers Association, Inc. v. Hinton, 315 U.S. 143, 146-47, 62 S.Ct. 520, 522, 86 L.Ed. 750 (1942) (suit by fish processor against independent fishermen's association not a case involving a labor dispute because case did not involve a controversy upon which the employer-employee relationship had a bearing).
 
 
 19
 Under this "economic self-interest test," the subject matter of the present case the picketing of AD&N would involve or arise out of the UTU-Rock Island labor dispute if AD&N were "substantially aligned" with Rock Island. See, e. g., Brotherhood of Railroad Trainmen v. Atlantic Coast Line Railroad Co., supra. In Atlantic Coast Line the employer seeking injunctive relief against the picketing was a railroad terminal which was substantially aligned with the struck employer, a railroad, in the sense that the railroad had a one-quarter ownership interest in the terminal and received services from the terminal that "in fact constitute(d) an integral part of (the struck railroad's) day-to-day operations." 362 F.2d at 651. A different situation prevailed here. There was substantial evidence for the district court to find that the secondary employer here AD&N did not provide the primary employer Rock Island with essential services or facilities. AD&N personnel did little more than help F&P exercise its contractual right to interchange Fordyce yard cars in order to continue rail service for its own customer, the Georgia-Pacific mill at Fordyce. Any Rock Island cars moved by AD&N personnel were moved for F&P's benefit, not Rock Island's. UTU has failed to show that AD&N performed essential services for Rock Island,[7] that AD&N aided Rock Island through a strike insurance plan,[8] or that AD&N and Rock Island otherwise had any significant commonality of interest.[9] In short, the evidence before the district court was that AD&N was not Rock Island's ally in the struggle between UTU and Rock Island.[10] Because UTU has failed to establish a substantial connection between its labor dispute and its picketing of the premises of AD&N, the "economic self-interest test" mandates the conclusion that the picketing did not grow out of the labor dispute and therefore was not protected by the Norris-LaGuardia Act.[11] See generally In re Brotherhood of Railway Clerks, supra, 605 F.2d at 1075.
 
 
 20
 UTU would have us avoid this result by rejecting the economic self-interest test in favor of a literal application of section 13(a). UTU argues the narrower scope circumscribed by the self-interest test is invalid in light of the express language and historical purpose of the Norris-LaGuardia Act. We disagree. Although the plain language of a statute is often controlling, it is impermissible to follow a literal reading that engenders absurd consequences where there is an alternative interpretation that reasonably effects the statute's purpose. United States v. Ryan, 284 U.S. 167, 175, 52 S.Ct. 65, 68, 76 L.Ed. 224 (1931). Absurd consequences and a reasonable alternative are present here.
 
 
 21
 Read as a verbal formula, without regard to its background and to the rest of the Norris-LaGuardia Act, section 13(a) would operate to bar injunctive relief in any case involving persons with direct or indirect interests in the same industry, trade, craft, or occupation, regardless of whether any of these persons has an interest in a labor dispute. Consider, for example, a diversity case in which plaintiff seeks specific performance of a contract to sell real property. If both plaintiff and defendant belong to the same industry, trade, craft, or occupation, or have direct or indirect interests therein, a literal construction of section 13(a) would operate to deprive the federal courts of injunctive jurisdiction.[12] The obvious lesson is that one cannot make sense of section 13(a) simply by focusing on the character of the parties; one must also consider the subject matter of the dispute. The Supreme Court has recognized as much in declining to follow a strict, technical construction of section 13(a) in cases that did not in fact involve a section 13(c) labor dispute, even though the cases plainly did involve adversaries with interests in the same industry. E. g., American Medical Association v. United States, 317 U.S. 519, 534-36, 63 S.Ct. 326, 331-332, 87 L.Ed. 434 (1943); Columbia River Packers Association, Inc. v. Hinton, supra, 315 U.S. at 146-47, 62 S.Ct. at 522.
 
 
 22
 The background of the Norris-LaGuardia Act indicates its intended scope. The House report advocating passage of the Norris-LaGuardia anti-injunction provisions explains that their purpose was "to protect the rights of labor in the same manner the Congress intended when it enacted the Clayton Act * * *." H.R.Rep.No.669, 72d Cong. 1st Sess. 3 (1932). Section 20 of the Clayton Act provides that "in any case between an employer and employees * * * involving, or growing out of, a dispute concerning terms or conditions or employment," a federal court may not enjoin persons from "ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do." 29 U.S.C. § 52. In a series of cases, and particularly in Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921), the Supreme Court interpreted section 20 to encompass only those cases in which the adversaries had an employer-employee relationship.[13] This interpretation ignored a union's interest in protecting its wage levels by seeking to represent all employees in the same industry in order to eliminate the competitive edge of non-union employers over union employers. Justice Brandeis dissented from the Court's narrow interpretation of section 20 because he believed the section "declare(s) the right of industrial combatants to push their struggle to the limits of the justification of self-interest * * *." Duplex Printing Press Co. v. Deering, supra, 254 U.S. at 488, 41 S.Ct. at 184 (dissenting opinion). It was to overturn the Duplex doctrine that the Norris-LaGuardia's anti-injunction provisions were passed. H.R.Rep.No.669, 72 Cong., 1st Sess. 7-8 (1932). See F. Frankfurter & N. Greene, The Labor Injunction 165-176, 216 (1930); C. Gregory, Labor and the Law, 193-94 (2d ed. 1958).
 
 
 23
 Read in light of this background, it is reasonable to conclude that section 13(a) was meant to preclude injunctive interference with bargaining or organizing on an industry-wide or craft-wide basis. It was not meant to extend an anti-injunctive shield for union activities beyond the place where the union's interests in a labor dispute cease. As one commentator explains:
 
 
 24
 * * * In this definition of labor disputes and of cases arising out of labor disputes, Congress gave complete recognition to certain theretofore proscribed stranger activities of unions in fulfillment of their heartfelt need to organize entire industries so that, by standardizing employment conditions throughout such industries, they could eliminate the competitive hazard to already established standards in existing unionized units of such industries, presented by the undercutting effects of nonunion wage and labor standard differentials.
 
 
 25
 As far as the federal courts were concerned, this act was Congress' green light to nation-wide union organizational campaigns, both for the purpose of securing the closed shop in individual units where a union was already established, and for unionizing all units throughout an entire industry the so-called "universal closed shop." It is as if Congress had said in this act:"This you may do, using the techniques we have suggested, as long as you can show that your union economic program, conceived as you and not anyone else sees it, is affected by the existing employment conditions in the units of the industry with which you are concerned. We have instructed the judges to withhold the use of the injunction against your self-help coercive activities directed along these lines. From now on it is up to you union people to promote your own economic interests, as you see them, within the area of conflict we have defined."
 
 
 26
 Gregory, supra, at 190, 192. But it remains that "participants in a labor dispute must be able to show an economic interest at stake in order to invoke the protection of the act at all." Id. at 194.[14] See generally id. at 158-99.
 
 
 27
 We thus conclude that the economic self-interest test reasonably defines the scope of the Norris-LaGuardia Act's anti-injunction provisions. The district court was not clearly erroneous in finding that UTU demonstrated no economic interest in pressuring AD&N to cease helping F&P service its customer-owner Georgia-Pacific. Because AD&N and the struck Rock Island Railroad were not "substantially aligned," UTU's picketing of AD&N was not within the permissible area of economic conflict and thus was not protected by the Norris-LaGuardia Act.
 
 B. Basis for Federal Jurisdiction
 
 28
 Having determined that the Norris-LaGuardia Act did not negate federal injunctive jurisdiction in this case, we address UTU's argument that federal law provided no basis for that jurisdiction. AD&N did not plead diversity of citizenship, but asserts that federal jurisdiction existed under the Railway Labor Act (RLA), 45 U.S.C. §§ 151-188, see 28 U.S.C. § 1331,[15] and the Interstate Commerce Act, 49 U.S.C. §§ 1-27, see 28 U.S.C. § 1337.[16] The district court, relying on Terminal Railroad Association v. Brotherhood of Railway Clerks, supra, 458 F.Supp. at 106, issued its injunction on the ground that secondary picketing is unlawful under the RLA. Intimations that secondary picketing under certain circumstances may be proscribed by the RLA also appear in In re Brotherhood of Railway Clerks, 605 F.2d 1073, 1075 (8th Cir. 1979), and Chicago & Illinois Midland Railway v. Brotherhood of Railroad Trainmen, 315 F.2d 771, 775 (7th Cir.), vacated as moot, 375 U.S. 18, 84 S.Ct. 61, 11 L.Ed.2d 39 (1963).
 
 
 29
 We hesitate to endorse the district court's reliance on the RLA because the rationale for invoking the RLA to enjoin the picketing involved in this case is not clear.[17] The National Labor Relations Act specifies that certain forms of secondary pressure by unions are enjoinable, 29 U.S.C. § 158(b)(4), but the RLA refers expressly neither to secondary activities nor to injunctions.[18] We do not doubt that secondary picketing may tend to subvert a general goal of the RLA the avoidance of "any interruption * * * to the operation of any carrier * * *." 45 U.S.C. § 151a(1). But the RLA's means of achieving this goal lies chiefly if not solely in the duties and procedures it creates "for the prompt and orderly settlement" of labor "disputes." 45 U.S.C. § 151a(4), (5).
 
 
 30
 It is true that federal courts have issued injunctions under the RLA to compel labor disputants to observe their duty to bargain over differences in good faith,[19] Chicago & North Western Railway v. United Transportation Union, 402 U.S. 570, 578-81, 91 S.Ct. 1731, 1735-1737, 29 L.Ed.2d 187 (1971); to submit "minor disputes" to binding arbitration, Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad, 353 U.S. 30, 39-42, 77 S.Ct. 635, 639-641, 1 L.Ed.2d 622 (1957); and to refrain from unilateral action in "major disputes" while compulsory bargaining procedures are pending, Detroit & Toledo Shore Line Railroad v. United Transportation Union, 396 U.S. 142, 149-53, 90 S.Ct. 294, 298-301, 24 L.Ed.2d 325 (1969). The rationale for these injunctions, however, is not that the RLA outlaws specified forms of unilateral action but that an injunction is necessary to preserve the integrity of the RLA's system of orderly settlement procedures. See International Association of Machinists v. Northwest Airlines, Inc., 304 F.2d 206, 211 (8th Cir. 1962).
 
 
 31
 Thus, unless we are to hold that the RLA flatly prohibits certain forms of secondary activity a point we do not reach the RLA justified an injunction in this case only if an injunction was necessary to promote or protect the RLA dispute settlement process. That process is relevant, obviously, only if there is a negotiable dispute within the contemplation of the Act.
 
 
 32
 Courts have characterized disputes under the RLA as either "major" or "minor." Negotiation over major disputes concerns changes in "rates of pay, rules, or working conditions," 45 U.S.C. § 151a(4), and thus looks to the formation of collective bargaining agreements. Minor disputes concern "interpretation or application of (existing) agreements," 45 U.S.C. § 151a(5), and thus involve the assertion of vested rights. See Elgin, Joliet & Eastern Railway v. Burley, 325 U.S. 711, 723-24, 65 S.Ct. 1282, 1289-1290, 89 L.Ed. 1886 (1945). The first step toward settlement of either kind of dispute is negotiation and conference between the parties. Thereafter, procedures for major and minor disputes diverge. In a major dispute, either party may invoke the conciliation process administered by the National Mediation Board. If mediation fails and if the parties do not agree to binding arbitration, then either party may resort to unilateral action unless the Mediation Board and the President of the United States decide the dispute should be made subject to the investigation of an emergency board. See Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969). In a minor dispute, completion of the negotiation and conference step permits either party to invoke the arbitration of the National Railroad Adjustment Board, whose decision is "final and binding" 45 U.S.C. § 153 (First) (m). See Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad, supra, 353 U.S. at 33-34, 77 S.Ct. at 636-637.
 
 
 33
 This statutory background illuminates AD&N's claim for injunctive relief under the RLA. UTU did not attempt to resolve its differences with AD&N through the RLA's administrative processes but instead resorted to picketing, without notice to AD&N. Although UTU had already exhausted RLA settlement procedures in its major dispute with Rock Island, AD&N argues UTU was also required to confer with AD&N or at least give notice of its intention to picket.
 
 
 34
 The difficulty with this argument is that the duties and procedures of the RLA are meaningful only in the presence of an RLA dispute.[20] A controversy between striking employees and a non-struck employer is neither a major nor a minor dispute, for it concerns neither the formation or alteration of a collective bargaining agreement nor the interpretation or application of an existing agreement: no collective bargaining contract exists or can exist between the striking employees and the non-struck employer.[21] Resort to the RLA settlement process would have been futile, for there was no bargaining agreement to reach.[22]
 
 
 35
 The RLA does recognize the possibility of a third kind of dispute "(a)ny other dispute," neither major nor minor which may be referred by either party to the Mediation Board if the dispute is "not adjusted in conference between the parties or where conferences are refused." 45 U.S.C. § 155 (First) (b). It is not at all clear, however, that this vaguely defined third category of disputes would encompass controversies between striking employees and non-struck employers, for the jurisdiction of the Mediation Board may well extend only to employer-employee disputes, see Note, Judicial Approaches to Secondary Boycotts Under the Railway Labor Act, 42 N.Y.U.L.Rev. 928, 933-34 (1967).
 
 
 36
 Although a more thorough examination of the RLA and other sources of labor law might well reveal a basis for federal injunctive jurisdiction,[23] it is not necessary to dwell further on the RLA here inasmuch as a line of authority supports AD&N's alternative argument that the district court had injunctive jurisdiction under the Interstate Commerce Act. Federal district courts have "original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce * * *." 28 U.S.C. § 1337. Federal jurisdiction under the Interstate Commerce Act exists where the remedy sought is inferable from the Act or hinges on an interpretation of it. Garrett v. Time-D.C., Inc., 502 F.2d 627, 629 (9th Cir. 1974).
 
 
 37
 The Interstate Commerce Act requires common carriers subject to its judrisdiction to provide "safe and adequate" transportation service "on reasonable request." 49 U.S.C. § 111o 1(a) (recodifying 49 U.S.C. § 1(1), (4)). A carrier may be liable in a federal damage action for the breach of this duty even when it is beset by labor controversies. Lakefront Dock & Railroad Terminal Co. v. ILA, supra, 333 F.2d at 552; see Brotherhood of Railway Clerks v. Florida East Coast Railway, 384 U.S. 238, 245, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966); United States v. Sea-Land Service, Inc., 424 F.Supp. 1008, 1011-12 (D.N.J.1977); Merchandise Warehouse Co. v. A.B.C. Freight Forwarding Corp., 165 F.Supp. 67, 74-76 (S.D.Ind.1958); see generally Johnson v. Chicago, Milwaukee, St. Paul & Pacific Railroad, 400 F.2d 968, 971-72 (9th Cir. 1968).[24] In Toledo, P. & W. Railroad v. Brotherhood of Railroad Trainmen, 132 F.2d 265 (7th Cir. 1942), rev'd on other grounds, 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534 (1944), the Seventh Circuit inferred form these federal duties a corresponding federal right to relief from unprivileged interference with the performance of these duties. Id. at 269-70. See also Lakefront Dock & Railroad Terminal Co. v. ILA, supra, 333 F.2d at 552; Chicago & Illinois Midland Railway v. Brotherhood of Railroad Trainmen, supra, 315 F.2d at 774-75; Brotherhood of Railroad Trainmen v. New York Central Railroad Co., 246 F.2d 114, 121-22 (6th Cir.), cert. denied, 355 U.S. 877, 78 S.Ct. 140, 2 L.Ed.2d 107 (1957).
 
 
 38
 UTU's picketing was not privileged. Although not clearly forbidden by the RLA, it was not endorsed, either.[25] Nor, as we have held, was the picketing protected from federal injunctive jurisdiction by the Norris-LaGuardia Act. For that reason Order of Railroad Telegraphers v. Chicago & North Western R. Co., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960) is inapposite. The Court in Railroad Telegraphers indicated that labor injunction plaintiffs cannot rely on non-labor legislation to remove the strictures of the Norris-LaGuardia Act. Id. at 339 n.15, 80 S.Ct. at 766. Accord, Lee Way Motor Freight, Inc. v. Keystone Freight Lines, Inc., 126 F.2d 931, 934 (10th Cir.), cert. denied, 317 U.S. 645, 63 S.Ct. 37, 87 L.Ed. 519 (1942) (Motor Carrier Act requirements do not enlarge federal injunctive jurisdiction in a case involving a labor dispute beyond limitations of Norris-LaGuardia). Here, however, the Norris-LaGuardia Act does not apply, and injunctive jurisdiction under the Interstate Commerce Act remains intact.
 
 IV. Irreparable Injury
 
 39
 It remains to consider whether the district court, possessing injunctive jurisdiction, abused its discretion in issuing injunctive relief. Given that AD&N has made its case on the merits, the focus now is on a balancing of harms. UTU argues AD&N failed to show a potential irreparable injury such as would justify injunctive relief because the harmful effects alleged were the ordinary incidents of peaceful picketing. We disagree. AD&N's potential harm in the absence of injunctive relief transcended the ordinary in that the district court found that three quarters of AD&N's operation would be shut down by UTU's picketing. See Wilson v. Milk Drivers & Dairy Employees Local 471, 491 F.2d 200, 206 (8th Cir. 1974). Moreover, as noted above, claims could have been filed against AD&N for failure to fulfill its statutory duty as a carrier. Any counteracting harm to UTU's interest in its labor dispute with Rock Island was negligible in light of the district court's finding that AD&N and Rock Island were not substantially aligned. The district court also properly considered that the public interest weighed heavily against UTU inasmuch as its unprivileged picketing would have shut down Georgia-Pacific plants employing three thousand workers. See Minnesota Bearing Co. v. White Motor Corp., 470 F.2d 1323, 1326 (8th Cir. 1973). Under these circumstances we cannot say the grant of injunctive relief was an abuse of discretion. See Doran v. Salem Inn, Inc., 422 U.S. 922, 931-32, 95 S.Ct. 2561, 2567-2568, 45 L.Ed.2d 648 (1975); Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action, 558 F.2d 861, 866 (8th Cir. 1977).
 
 
 40
 Affirmed.
 
 
 
 *
 The Honorable Robert L. Kunzig, Judge, United States Court of Claims, sitting by designation
 
 
 [1]
 UTU Local 1121 and its officers are also parties to this action. For convenience we refer to the defendant-appellants collectively as UTU
 
 
 [2]
 The Honorable Elsijane T. Roy, United States District Judge for the Eastern and Western Districts of Arkansas
 
 
 [3]
 The destination of at least some of this F&P freight was apparently the Georgia-Pacific plant complex at Crosset
 
 
 [4]
 We use the label "secondary" here not to imply any legal conclusion but to describe union activity, whether lawful or not, that is aimed at an employer other than the employer with whom the union has its primary dispute
 
 
 [5]
 Although we need not decide the question here, the appeal may also be justiciable on the ground that issues involved in the district court's order are "capable of repetition, yet evading review * * *." Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). See Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 125-27, 94 S.Ct. 1694, 1699-1700, 40 L.Ed.2d 1 (1974); Solien v. Miscellaneous Drivers & Helpers Union Local No. 610, 440 F.2d 124, 127-28 (8th Cir.), cert. denied, 403 U.S. 905, 91 S.Ct. 2206, 29 L.Ed.2d 680 (1971)
 
 
 [6]
 Concluding that the Norris-LaGuardia Act's anti-injunction ban applied in this case would raise the further question of whether the Act's terms must be accommodated with subsequently-enacted legislation supporting injunctive jurisdiction. See, e. g., Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 250, 90 S.Ct. 1583, 1592, 26 L.Ed.2d 199 (1970). We do not reach the accommodation issue
 
 
 [7]
 There are indications in the record that AD&N personnel performed some rail switching tasks that before the strike were performed by Rock Island. Performance of these tasks was incidental to AD&N's own goal of serving Georgia-Pacific, however, and was not for the benefit of Rock Island This was not a case where the union was picketing an employer by doing "struck work" or by otherwise lending substantial aid to the struck employer. United Steelworkers v. NLRB, 376 U.S. 492, 499, 84 S.Ct. 899, 904, 11 L.Ed.2d 863 (1964); Brotherhood of R.R. Trainmen v. Atlantic Coast Line R.R., 362 F.2d 649, 650-51 (5th Cir. 1966); Douds v. Metropolitan Federation of Architects Local 231, 75 F.Supp. 672, 676 (S.D.N.Y.1948)
 
 
 [8]
 Mutual participation in a strike insurance plan has been held to be a strong indication of substantial alignment. E. g., Southern Ry. v. Brotherhood of Ry. Clerks, 458 F.Supp. 1189, 1191-92 (D.S.C.1978); Alton & Southern Ry. v. Brotherhood of Ry. Clerks, 84 Lab.Cas. (CCH) P 10,835 at 19,256-57 (D.D.C.), aff'd, (D.C.Cir. Sept. 15, 1978), cert. denied, 439 U.S. 996, 99 S.Ct. 597, 58 L.Ed.2d 670 (1978)
 
 
 [9]
 UTU seeks to demonstrate the "interrelatedness" of AD&N and Rock Island by emphasizing that F&P, which had common management and ownership with AD&N, leased rail cars from Rock Island. As the National Labor Relations Board has said in an analogous context, however, "(a) person does not become an ally of a struck employer by continuing a pre-strike business relationship." Drivers, Warehouse & Dairy Employees Local 75, 176 N.L.R.B. 530, 532 (1969). Nor did the leasing arrangement so entwine AD&N and Rock Island as to make them a common economic adversary of UTU. See id
 
 
 [10]
 Concepts such as "allied employer" have been developed primarily by tribunals interpreting the National Labor Relation Act's ban on certain forms of secondary activity, see 29 U.S.C. § 158(b)(4). See generally Lesnick, The Gravamen of the Secondary Boycott, 62 Colum.L.Rev. 1363 (1962). UTU objects to the use of analogies drawn from section 158(b)(4) decisions for purposes of applying the anti-injunction provisions of the Norris-LaGuardia Act. That objection is out of place in light of our conclusion that the scope of Norris-LaGuardia's protection is determined by the union's self-interest. Under that test the relationship between the struck employer and the employer seeking injunctive relief is relevant to the question whether the case involves a labor dispute. We do not, of course, endorse the wholesale importation of section 158(b)(4) concepts into a Norris-LaGuardia inquiry. Nor do we suggest that the scopes of the Norris-LaGuardia Act (which protects some secondary activity) and section 158(b)(4) (which proscribes some secondary activity) are precisely complementary
 
 
 [11]
 While it is plaintiff's burden to establish compliance with Norris-LaGuardia's procedural requirements under 29 U.S.C. §§ 107, 108 once it appears a labor dispute it involved, the Act operates in the nature of an affirmative defense, leaving it up to defendant to show the Act has any application
 
 
 [12]
 Norris-LaGuardia Act § 7, 29 U.S.C. § 107, provides that no federal court has injunctive jurisdiction "in any case involving or growing out of a labor dispute" except under specified circumstances, including showings that the complainant's property will be subject to substantial and irreparable harm absent injunctive relief and that the responsible public officers have failed to protect complainant's property
 
 
 [13]
 Other cases in this series include Bedford Cut Stone Co. v. Journeymen Stone Cutters' Ass'n, 274 U.S. 37, 47, 47 S.Ct. 522, 525, 71 L.Ed. 916 (1927) (authorizing injunction on behalf of non-union quarry owners against union stone-cutters who sought to unionize quarry workers by refusing to work on stone started or prepared by non-union workers); American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 202, 42 S.Ct. 72, 76, 66 L.Ed. 189 (1921) (section 20 does not prevent injunction sought by non-union foundry against picketing for higher wages by outside union members who do not seek employment at foundry)
 
 
 [14]
 This view is at least arguable consistent with that of the influential promoters of the Norris-LaGuardia Act. Relying on Justice Brandeis' dissent in Duplex Printing Press Co. v. Deering, 254 U.S. 443, 482, 41 S.Ct. 172, 182, 65 L.Ed. 349 (1921), they explain that section 13 "permits the collaboration of efforts between unions whom substantial interests make natural allies. It withholds immunity from the chancellor's decree at a point where combination aims to include unions that have no economic bond but only a sympathetic interest." F. Frankfurter & N. Greene, The Labor Injunction, 217 (1930)
 
 
 [15]
 Section 1331 provides federal district courts shall have original jurisdiction of civil actions that arise under federal law and involve matters in controversy in excess of $10,000
 
 
 [16]
 Section 1337 provides federal district courts shall have original jurisdiction of civil actions that arise under any federal statute regulating commerce
 
 
 [17]
 For discussions of the problems involved, see Wimberly, The Labor Injunction Past, Present, and Future, 22 S.C.L.Rev. 689, 719-22; McGuinn, Injunctive Powers of the Federal Courts in Cases Involving Disputes under the Railway Labor Act, 50 Geo.L.J. 46, 65-67 (1961); Recent Developments, 68 Mich.L.Rev. 346, 355-59 (1969); Note, Judicial Approaches to Secondary Boycotts Under the Railway Labor Act, 42 N.Y.U.L.Rev. 928, 933-38 (1967); Recent Developments, Railroad Secondary Boycotts: Railway Labor Act v. Norris-LaGuardia, 42 Wash.L.Rev. 935, 939-45 (1967)
 
 
 [18]
 The National Labor Relations Act's ban on secondary activities applies only to the activities of "labor organizations" which the Act defines as a representative of "employees," and excludes from its definition of employees those employees covered by the RLA. 29 U.S.C. §§ 152(3), (5), 158(b)(4)
 
 
 [19]
 RLA § 2 (First), 45 U.S.C. § 152, provides:
 It shall be the duty of all carriers * * * and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interrpution to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.
 
 
 [20]
 AD&N cites several cases for the proposition that strikes by RLA unions over non-bargainable issues may be enjoined. E. g., Illinois Cent. R.R. v. Brotherhood of Locomotive Engineers, 443 F.2d 136, 144 (7th Cir. 1971). Each case cited, however, involved a dispute between a RLA union and the employer of the union's members and can be explained on the basis that the union failed to abide by its duty to bargain in good faith, see note 19 supra, or to observe the procedural formalities established by RLA §§ 5 and 6, 45 U.S.C. §§ 155 and 156. The absence of an employer-employee dispute renders those duties inapposite here. But see McGuinn, supra note 17, at 66-67 & n. 73
 
 
 [21]
 AD&N did not attempt to enjoin the work stoppage of its own employees on the basis that it had a negotiable RLA dispute with them. AD&N therefore cannot rely on cases such as Northwest Airlines, Inc. v. Air Line Pilots Ass'n, Int'l, 442 F.2d 246, 248-49 (8th Cir. 1970), cert. denied, 404 U.S. 871, 92 S.Ct. 70, 30 L.Ed.2d 116 (1971) (where bargaining contract arguably prohibits union-authorized sympathy strike, strike may be enjoined pending arbitration of the "minor dispute" over contract's meaning)
 
 
 [22]
 A further difficulty is that AD&N did not attempt to invoke RLA procedures, see Manion v. Kansas City Terminal Ry., 353 U.S. 927, 927, 77 S.Ct. 706, 1 L.Ed.2d 722 (1957), although UTU's unilateral action may have excused AD&N of this usual requirement, see Chicago & Ill. Midland Ry. v. Brotherhood of R.R. Trainmen, 315 F.2d 771, 775 (7th Cir. 1963)
 
 
 [23]
 See, e. g., McGuinn, supra note 17, at 66-67 & n.73 (suggesting reliance on 45 U.S.C. § 155 (First) (b) or the "good faith bargaining" requirement of 45 U.S.C. § 152(1); Recent Developments, supra note 17, 68 Mich.L.Rev. at 346 (suggesting development of federal common law to govern secondary activity by RLA unions)
 
 
 [24]
 A judicial damage remedy against carriers was once expressly provided for in 49 U.S.C. §§ 8 and 9. These provisions were largely repealed in the Revised Interstate Commerce Act, Pub.L.No.95-473, § 4(b), (2), 92 Stat. 1466-70 (1978). This Act was meant to effect no substantive change, however, and it was expressly contemplated that private parties could invoke 28 U.S.C. §§ 1331, 1337 to seek remedies inferable from the duties imposed by the Act. H.R.Rep.No.95-1395, 95th Cong., 2d Sess., reprinted in (1978) U.S.Code Cong. & Admin.News, pp. 3009, 3016
 
 
 [25]
 "(T)he Act is wholly inexplicit as to the scope of allowable self-help." Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 391, 89 S.Ct. 1109, 1122, 22 L.Ed.2d 344 (1969). Jacksonville Terminal held secondary activity by a RLA union immune from state injunctive interference. Its reasoning does not support a like immunity at the federal level